Argued and submitted April 8; resubmitted In Banc November 19, 1996, affirmed
January 29, petition for review allowed June 3, 1997 (325 Or 403)
See later issue Oregon Reports

Jane DOE,
*Appellant,*

*v.*

DENNY'S, INC.,
a California corporation;
Robert Hibbard; and Ken Jacobs,
*Respondents.*

(CV 940538; CA A89182)

931 P2d 816

In Banc

Michael B. Collins argued the cause for appellant. With him on the briefs was Collins & Collins.

Emil R. Berg argued the cause for respondents. With him on the brief was Yturri, Rose, Burnham, Bentz & Helfrich.

EDMONDS, J.

Warren, J., dissenting.

**EDMONDS, J.**

Plaintiff appeals from summary judgment on her claims for unlawful employment practices under ORS 659.425. ORCP 47. She also raises an issue concerning the discovery of a document. ORCP 36. We affirm.

Plaintiff worked as a server at a restaurant owned by defendant Denny's, Inc. Defendant Jacobs is the restaurant's manager, and defendant Hibbard was plaintiff's immediate supervisor. Shortly after she began working at Denny's, plaintiff told Hibbard that she is HIV positive. The following events occurred thereafter, according to plaintiff's complaint:

"5.

"Shortly after Plaintiff's third week of employment, Hibbard called her into his office and advised her that a customer had complained because he knew Plaintiff and knew of her HIV status. Hibbard stated that the customer threatened to advise other patrons at the restaurant that there was an employee who was HIV-positive and advised Hibbard that the complaining person would not be patronizing the establishment so long as Plaintiff worked there.

"6.

"Shortly thereafter, Hibbard called Plaintiff into his office and advised her that he could not fire her, and that he didn't want to because she was a good worker. However, defendant Hibbard also advised Plaintiff that it would destroy their business if she continued to work there and that he had been instructed to take care of the problem. Subsequently, Hibbard and/or Jacobs advised the Plaintiff *that she would be laid off*, on the pretext that the restaurant was over-staffed, and that Defendants did not need Plaintiff as an employee. *Plaintiff was advised that this was done solely as a method of avoiding use of the term 'fired' in reference to the termination of her employment due to the fact that she was HIV-positive.*

"7.

"*After the plaintiff was laid off*, a new employee was hired to take her place within a short period of time thereafter." (Emphasis supplied.)

On appeal, plaintiff argues that for purposes of summary judgment, she pled and proved under ORS 659.425 either a claim of wrongful discharge or that defendants discriminated against her because she is HIV positive. We view the facts in the light most favorable to plaintiff, the nonmoving party, drawing all inferences in her favor. *Wallulis v. Dymowski*, 323 Or 337, 340, 918 P2d 755 (1996).

At summary judgment, plaintiff was unable to produce evidence that she had been fired because of her HIV status. According to plaintiff, she felt it "necessary for me to inform somebody of my status." She approached Hibbard in the break room when they were alone and confided to him that she was HIV positive. "He [Hibbard] didn't want the employees to know, and I didn't want the employees to know."

Hibbard testified that during the first conversation, plaintiff said that if her condition caused any problems, she would resign. Hibbard responded by saying that he would have to consult with the district manager about the ramifications of her condition. When asked if anything else was said during the first conversation, plaintiff said, "Not that I remember."

When plaintiff came to work some time later, Hibbard asked her to come into his office. According to plaintiff, Hibbard explained that a "regular customer" had complained and that the customer had said, "that they were going to tell other potential customers of my status, and that they were not going to patronize the establishment again." Plaintiff testified,

"A   And then he turned and he looked at me and I just—He said that he couldn't fire me, he couldn't lay me off, and that was when I offered to resign.

"Q   You said he couldn't fire you?

"A   He couldn't fire me, he couldn't lay me off, and he said, You know that. * * *

"* * * * *

"A   * * * I didn't know what I was going to do, what to say. And I had told him I didn't want to be the cause of any conflict. And he said it would destroy his business later on, is what he said.

"Q   Okay.

"A   And he said he basically was going to leave it up to me to decide what I was going to do. * * *

"* * * * *

"Q   What did you say?

"A   I just told him I would resign or quit. And I told him I'd have to talk to my case worker first and find out what she was going to say. I told him because I couldn't just up and quit or resign without consulting her, without trying to get my benefits back."

After the conversation with Hibbard, plaintiff talked with her case worker and her boyfriend, who also told her that she could not be fired because of her HIV status. Ultimately, she and Hibbard reached an agreement to treat her resignation as a layoff, and she received a letter of reference from defendants that described her resignation in that fashion.[1]

Plaintiff argues that defendants' conduct violated ORS 659.425 in two ways. First, she contends that a constructive discharge for discriminatory reasons occurred under ORS 659.425(1) and that "the issue for the jury to decide is whether or not the plaintiff resigned due to unacceptable or intolerable working conditions under the test in *Bratcher v. Sky Chefs, Inc.*, 308 Or 501, 506-07, 783 P2d 4 (1989)." In *Bratcher*, the court held that the constructive discharge of an at-will employee because of unacceptable working conditions could be tortious if the employer deliberately

---

[1] The letter said, in part:

"To whom it may concern:

"I am pleased to have the opportunity to give [plaintiff] a reference. In the restaurant profession we see a lot of people come and go, some have the ability for the service industry and others do not. [Plaintiff] has that ability, but due to over staffing on our part, we were forced to lay her off.

"I feel that [plaintiff] would be an asset to any company for several reasons: She always greets customers with a warm and friendly smile. She handles complaints in a quickly [sic] and satisfying fashion, and she is always willing to help other employees, making her a wonderful team player."

created or maintained the working conditions with the intention of forcing the employee to leave the employment and the employee left the employment because of the working conditions. The tort of wrongful discharge exists apart from the provisions of ORS 649.425(1) which prohibits the employment practice of discharging disabled persons because of their disability. Thus, plaintiff's argument as framed involves two distinct issues: (1) Whether she was constructively discharged, and (2) whether the discharge violated ORS 659.425(1).[2] Alternatively, she argues that a jury could find that the revealing of the information to plaintiff about the customer's complaint was discriminatory in violation of the statute because it was motivated by the hope that plaintiff would be induced to resign.[3]

We turn to the language of the statute. ORS 659.425(1) makes it an unlawful employment practice for any employer to discriminate in the "terms, conditions or privileges of employment" because an individual has a physical or mental impairment that does not prevent the performance of the work involved or because the individual is regarded as having a physical or mental impairment. Plaintiff is physically impaired in that she is HIV positive. Defendants do not argue that her condition prevents her from performing the duties of a server. Rather, they argue that they did not discriminate against plaintiff in any term, condition or privilege of her employment.

■ We agree with defendants. It is uncontroverted that the conditions of plaintiff's employment were no different

---

[2] We decided similar issues in *Wooten v. Viking Distributing Co., Inc.*, 136 Or App 56, 899 P2d 1219 (1995), utilizing the elements of the tort of wrongful discharge as one component of the analysis.

[3] Plaintiff argues that:

"Defendants admit that plaintiff's HIV-positive status was perceived as a problem by them due to public and employee perceptions that would result in plaintiff being "shunned" or "harassed" and due to fears on their part that, because of their perceptions their business would be adversely affected. Thus, defendants' purpose in revealing this information to plaintiff was discriminatory * * *. Defendants *admit* that plaintiff was informed that her disability was a problem for defendants because of perceived public perception of that disability. Defendants admit that the motivation for revealing this information was so that she would resign from the position, which she did." (Emphasis in original; citation to deposition omitted.)

after the conversation with Hibbard than before it was held. In its reach to find a violation of ORS 659.425, the dissent posits that the holding of a meeting with plaintiff and the making of "a subject that he [Hibbard] could not legally use to evaluate plaintiff's work performance the focus of the meeting" was the action that violated the statute. 146 Or App at 70. Obviously, holding a meeting with an employee to discuss the report of a customer that concerned the employee cannot be an unlawful employment practice under the statute. If a violation occurred, it must have occurred because of the content of the conversation between Hibbard and plaintiff as set out previously in this opinion.

First, the dissent mischaracterizes the import of the evidence. No evaluation of plaintiff's past work performance occurred during the meeting. Rather, Hibbard simply reported the customer's statements to plaintiff, told her about his concern about the effect of her condition on business and assured her that he could not fire or lay her off because of her condition. He made it clear that her employment continued and that it was left to her to decide whether she should do anything in response to the customer's statements. The only evidence is that plaintiff brought up the subject of resigning and did resign only after she discussed the matter with her boyfriend and her caseworker, who also told her that she could not be fired because of her HIV condition. Moreover, there is no contention that Hibbard subjected her to ridicule or verbal abuse during the conversation. Also, he did not threaten to expose her physical condition to others so as to subject her to future ridicule or abuse by other employees or customers if she continued in his employ. The dissent's argument that Hibbard put verbal pressure on plaintiff during the meeting to resign is pure conjecture, as is her assertion that defendants would discriminate against her in the future. There is no evidentiary basis to support either contention.[4]

---

[4] In her affidavit in contravention of defendants' motion for summary judgment, plaintiff does not contend that Hibbard verbally pressured her. Rather, her affidavit expresses her subjective reaction to Hibbard's statements: "When Mr. Hibbard told me that the business of the restaurant would suffer if I continued to work there, but that he could not fire me, I felt that under these circumstances, the working conditions at Denny's were intolerable and if I continued to work there, I would be subjected to humiliation and abuse because of my HIV status. At no time,

At the heart of the dissent's position is the belief that the statute prohibited Hibbard from raising the subject matter of her condition with plaintiff in the manner described by her testimony and that the statute required defendants to take some affirmative action on behalf of plaintiff. The subject matter of the conversation did not change the terms or conditions of plaintiff's employment. Defendants did not fire plaintiff, change her work hours, pay her less money or deprive her of a benefit or privilege that other employees had under their employment relationships. Moreover, there is no evidence that any employee or customer of defendants had harassed plaintiff because of her condition prior to the meeting, or had acted in some other way that had affected her work environment in a manner that imposed a duty on defendants to undertake preventive or remedial measures. Nor is there evidence that plaintiff requested that defendants undertake such an action.

The dissent states that the conversation violated OAR 839-06-250, which provides in part that the attitude of the public may not be considered by the employer in evaluating the person's ability to perform the work involved. That assertion adds content to Hibbard's statements that did not occur. He made no evaluation of plaintiff's ability to perform her work based on her condition because of customer perception. He did not tell her that he believed that her condition impaired her ability to work and that she should quit, or something akin to those kinds of remarks. As reported by plaintiff, Hibbard simply told her about the customer's complaint, gave his opinion as to what effect the complaint could have on Denny's business and said that he could not fire her because of her condition.

■ Actionable discrimination under the statute requires that an employee be treated differently in the work place because of a physical condition in a manner proscribed by the statute. Hibbard's statement, made during a private conversation with plaintiff, that the customer's statements about

---

did Mr. Hibbard ever encourage me to continue to work at Denny's. At no time, did Mr. Hibbard ever indicate to me that attempts would be made to shield me from this type of abuse or that other alternatives were available that would allow me to continue to work at Denny's."

plaintiff's condition could destroy Denny's business did not change anything concerning the terms or conditions of her employment. Even if the jury could properly infer from Hibbard's statements and demeanor that defendants hoped that plaintiff would resign, that hope was not expressed in any inducement or threat that changed a term, condition or privilege of her employment. In sum, defendants said and did nothing that violated the statute. The terms and conditions of plaintiff's employment were the same before, during and after the conversation. Similarly, plaintiff's theory of constructive discharge also fails because there is no evidence of any intolerable "conditions" of employment that forced her to resign. Summary judgment on both claims was granted properly.

Finally, plaintiff assigns as error the trial court's denial of her motion to compel discovery. When his deposition was taken, Jacobs testified that he prepared a report for his employer sometime previously and that in preparation for his deposition, he had reviewed the report within a day or two of the deposition. Plaintiff requested production of the report and subsequently filed a motion to compel production. ORCP 36 B(3) governs pretrial discovery. In substance, it provides that a party may obtain discovery of documents and tangible things prepared in anticipation of litigation for trial only on a showing that the party seeking discovery has substantial need of the materials in the preparation of that party's case and is unable, without undue hardship, to obtain a substantial equivalent of the materials by other means. We review the trial court's decision for an abuse of discretion. *Farmers Insurance v. Hansen*, 46 Or App 377, 611 P2d 696 (1980).

Plaintiff argues that the trial court never exercised its discretion in this instance. Defendants respond that plaintiff made no showing that she had substantial need of the report in the preparation of her case or that she was unable without undue hardship to obtain a substantial equivalent of the materials by other means. We disagree with plaintiff's assertion that the trial court never exercised its discretion. In fact, the trial court denied the motion to compel on the ground that the document was "work product." In that light,

it was incumbent on plaintiff to demonstrate that the document fell within an exception to the prohibitions against discovery of work products. There is no basis on this record from which to conclude that the trial court abused its discretion in concluding that plaintiff had not met that burden. The trial court did not err when it denied plaintiff's motion to compel and when it granted summary judgment.

Affirmed.

**WARREN, J.,** dissenting.

A jury could find that defendants, on learning that plaintiff is HIV positive and that at least one customer was aware of her condition, decided to induce her to resign as an employee of defendant Denny's. It could also find that, in order to achieve that result, they told her that customers objected to her presence because of her disability and that her continued employment would destroy the business, implicitly informed her that she would have to deal with customer reactions on her own, and concluded by saying that, while they could not fire her, they would leave it up to her to decide what to do. The majority holds that no jury could find that those actions discriminated against plaintiff, because of her disability, in the terms and conditions of her employment. I cannot join an opinion that so flagrantly ignores reality. I therefore dissent.[1]

The beginning of the problem with the majority opinion is its failure to consider all of the relevant facts.[2] According to plaintiff, when she told defendant Hibbard about her HIV status, his face took on a new expression and

---

[1] I concur with the majority's conclusion that plaintiff has not established the elements of a wrongful discharge, primarily because she has not shown that her working conditions had become objectively intolerable at the time that she resigned. *See McGanty v. Staudenraus,* 321 Or 532, 557, 901 P2d 841 (1995). I find it curious, however, that the majority relies on *Bratcher v. Sky Chefs, Inc.,* 308 Or 501, 783 P2d 4 (1989), and a case that we decided under *Bratcher,* in discussing the issue, because *McGanty* partially overruled *Bratcher.* 321 Or at 555. Although the parties were not aware of *McGanty* until after oral argument, we certainly are aware of it now.

[2] I state the facts, including all reasonable inferences from the evidence that the parties submitted, most favorably to plaintiff. *Stoeger v. Burlington Northern Railroad Co.,* 323 Or 569, 572, 919 P2d 39 (1996).

his demeanor changed. He appeared startled and was thereafter much more aloof and unfriendly than he had previously been. When Hibbard told his superior, defendant Jacobs, about defendant's condition, Jacobs did not know how to handle the problem. He later told plaintiff that he had talked with his boss, who told him to "take care of" the situation.[3]

After his conversation with Hibbard, Jacobs learned from his brother, another Denny's employee, that a customer was aware of plaintiff's status and would not return to the restaurant while she worked there. Jacobs then asked Hibbard to pass that information on to plaintiff and to find out what she had to say about it. Hibbard called plaintiff into his office, told her of the customer complaint, told her that the customer intended to inform others of plaintiff's condition, told her that the situation would either harm or destroy the business, and, after saying that he could not fire her, said that he would leave it up to her what to do.

It is hard to conceive how defendants could have played more effectively on plaintiff's desire for privacy, her fear of public reaction to her condition, her sense of responsibility toward her employer, and her guilt over any harm her condition might cause it. That is, it is hard to conceive how defendants could have made better use of plaintiff's disability in an effort to get rid of her without directly firing her. In any event, that effort succeeded.

At the start of the conversation, plaintiff thought that Hibbard was going to fire her and that he had a right to do so. Even after he told her that he could not fire her, she felt backed into a corner and did not know what to do. She believed that she would be subject to humiliation and abuse because of her HIV status if she continued to work at Denny's. As one would expect, she had been shocked and dismayed when, several years earlier, she learned that she was infected with HIV. She originally told Hibbard about her condition privately because she did not want other employees to learn about it. Now Hibbard told her that that condition

---

[3] Hibbard testified that he told Jacobs that plaintiff had offered to resign if her condition was a problem. The majority fails to note that plaintiff denies making that statement to Hibbard and that on summary judgment we must treat plaintiff's denial as true.

would become public knowledge, that it would cause great harm to Denny's, that defendants intended to place the entire burden of responding to the problem on her shoulders, and, by implication, that defendants intended to do nothing to help her prepare or make that response.

ORS 659.425(1) prohibits defendants from discriminating against plaintiff "in terms, conditions or privileges of employment" because of her physical or mental impairment. The majority holds that defendants did not discriminate because there is no contention that Hibbard "subjected her to ridicule or verbal abuse during the conversation" and because defendants "did not fire plaintiff, change her work hours, pay her less money or deprive her of a benefit or privilege that other employees had * * *." Even though the jury could infer that defendants hoped that Hibbard's statements would induce plaintiff to resign, they "did nothing that violated the statute." 146 Or App at 65-66. The majority takes a remarkably obtuse view of both the statutory requirements and the situation in which defendants placed plaintiff.

Hibbard, plaintiff's supervisor, initiated the meeting with plaintiff in order to discuss customer reaction to her HIV status, which is a disability, and the effect of that reaction on the business. The meeting thus was not a "private conversation," 146 Or App at 66, but an official part of plaintiff's employment and plaintiff participated in it because her supervisor required her to do so. The meeting was a term or condition of her employment.

Hibbard made a subject that he could not legally use to evaluate plaintiff's work performance the focus of the meeting. Under OAR 839-06-250,[4] customer reaction to plaintiff's disability is not something that defendants could consider in determining whether she could perform the work involved in her job. However, all that Hibbard talked about was customer reaction, the damage that it would do to the business, and whether plaintiff would take any steps to alleviate that harm.

---

[4] OAR 839-06-250 provides:

"The attitude or preference of employers, managers, supervisors, co-workers, customers, clients, or the general public toward the person's perceived or actual impairment may not be considered by the employer in evaluating the person's ability to perform the work involved."

Hibbard did not suggest that defendants intended to do anything to help plaintiff deal with problems arising from her HIV status. Rather, he placed the entire burden on her, the person with the disability, and did not indicate that she would have any support from the business in facing customers if she did not resign. A jury could find that the purpose of the entire conversation was to induce plaintiff's resignation and that defendants, thus, discriminated against her by using a term or condition of her employment—a meeting with her supervisor—to force her out for reasons that ORS 659.425(1) forbids.[5]

Simply asking plaintiff what she intended to do suggested, first, that there was something about her HIV status that required someone to do something and, second, that plaintiff, not defendants, was the one who had to do it. Hibbard went beyond informing plaintiff of the complaint; he told her that the complaint required action and that it was up to her to take that action, because defendants would not. Under this pressure, plaintiff took the action that defendants wanted her to take, that they tried to get her to take, and that they could not legally have taken themselves. They thereby achieved indirectly what they could not have done directly— to get rid of plaintiff. That Hibbard did not abuse her or reduce her pay is irrelevant. Defendants let plaintiff know that they would throw her to the wolves. She did not have to wait to see how hard the wolves bit in order to have a discrimination claim.

Defendants had an established, nondiscriminatory approach available to deal with this situation. The law concerning reasonable accommodation to a disability provides that approach by analogy.[6] ORS 659.425(1)(a) requires an employer to make a reasonable accommodation to an employee's disability if doing so will enable the employee to perform

---

[5] This conclusion would be obvious if plaintiff were African-American and if customers objected to her presence on that ground. A meeting in which her employer attempted to induce her to resign by telling her that the reaction might destroy the business would clearly discriminate against her on the ground of race in violation of ORS 659.030(1)(b). There is no fundamental difference between that situation and plaintiff's actual claim of discrimination in violation of ORS 659.425(1) based on her HIV status.

[6] Because plaintiff was physically able to perform the work involved, the employer's obligation to make a reasonable accommodation does not apply directly. ORS 659.425(1)(a).

the work involved. Federal law under the Americans with Disabilities Act, which creates obligations similar to those under ORS 659.425, has developed that duty in a way that focusses on practical problem solving. That law emphasizes that the employer and employee should engage, in good faith, in an interactive process to find a reasonable accommodation to the employee's disability. The employer should initiate the process, but when the process breaks down the party responsible for the breakdown is likely to lose a discrimination action. *See* 29 CFR § 1630.2(o)(3); *Beck v. University of Wisconsin Bd. of Regents*, 75 F3d 1130 (7th Cir 1996); *see also Bultemeyer v. Fort Wayne Community Schools*, 100 F3d 1281 (7th Cir 1996) (employer has obligation to sit down with employee and work toward a reasonable accommodation). The goal is for the employer to use the law as a foundation for creating productive employees rather than seeking some technical escape from the law's obligations. Defendants made no effort to begin such a process; Hibbard's goal in meeting with plaintiff was not to seek a solution but to get rid of her. The majority's endorsement of defendants' technical defense is both incorrect and ignores the purpose of the law's protection for people with disabilities.

Finally, I dissent from the majority's affirmance of the trial court's order denying discovery of a letter that Jacobs wrote, under instructions from one of Denny's attorneys, as part of Denny's informal investigation of this matter. I will not go into detail but will simply comment that the trial court incorrectly decided that there was no potential waiver of the work-product doctrine and therefore failed to exercise its discretion to determine whether to compel production. The majority is thus incorrect in affirming the decision on the ground that it was within the trial court's discretion and in ignoring the effect of OEC 612 and ORCP 39 D on its decision. Federal courts discussing this issue give considerable attention to the federal counterpart of those rules. I would remand for the trial court to exercise its discretion under the correct standard. *See In Re Atlantic Financial Mgmt. Securities Lit.*, 121 FRD 141, 143 (D Mass 1988); *Laxalt v. McClatchy*, 116 FRD 438, 454 (D Nev 1987); *Wheeling-Pittsburgh Steel v. Underwriters Labs.*, 81 FRD 8, 10 (ND Ill 1978); *Berkey Photo, Inc. v. Eastman Kodak Co.*, 74 FRD 613, 617 (SDNY 1977).

I dissent.

Riggs and Armstrong, JJ., join in this dissent.