Argued and submitted September 4, 2009, affirmed June 9, 2010

Anthony MARTIN,
*Plaintiff-Appellant,*

*v.*

DHL EXPRESS (U.S.A.), INC.,
an Ohio corporation,
dba DHL Express,
*Defendant-Respondent.*

Multnomah County Circuit Court
070100622; A139225

234 P3d 997

Jon M. Egan argued the cause and filed the briefs for appellant.

Richard R. Meneghello argued the cause for respondent. With him on the brief was Fisher & Phillips LLP.

Before Landau, Presiding Judge, and Schuman, Judge, and Ortega, Judge.

SCHUMAN, J.

## SCHUMAN, J.

Plaintiff was a district sales manager for defendant, DHL Express, Inc., and was terminated, according to defendant, for poor performance. Plaintiff brought this action, arguing that defendant breached the parties' employment contract by not paying plaintiff a commission that was due and owing at the time of his termination. Defendant countered that the "commission" was, in fact, a bonus, and that plaintiff had no right to any payment; according to defendant, the employment contract specified that plaintiff would be entitled to the payment only if he was employed by defendant at the end of the quarter, and plaintiff was terminated for cause before that time. After denial of cross-motions for summary judgment and a bench trial, the trial court found in favor of defendant, and plaintiff now appeals. We affirm.

Plaintiff began working for defendant in February 2004 as a district sales manager. He was an at-will employee throughout his employment. As a district sales manager, he earned a salary and, in addition, took part in a "Sales Incentive Program," one component of which was called a monthly quarter-to-date (QTD) commission: a payment, over and above salary, based on quarterly performance. Although the payment was for a quarter's performance, it was paid monthly. Thus, if a district sales manager such as plaintiff was on track to achieve a certain quarterly sales goal, he or she would receive a prorated advance for the first and second month of the quarter. Once the final eligibility and payout amounts were determined after the third month—the end of the quarter—the manager was then paid the remaining balance of any earned commission. If the quarterly aggregate commission earned was less than the sum of the amounts paid in the previous two months (that is, if the third month's performance was so bad that it resulted in a quarterly total that was less than the goal), defendant would recover the amounts advanced during the first two months from future earnings.

The Sales Incentive Program contained the following language:

> ***Terminations:*** Participants whose employment ends prior to the last business day of the measurement period (quarter or year) are not eligible to receive an incentive for

that period. Participants must work through the last day of the period to be eligible for an incentive in that period.

"* * * * *

*"**Contingency:*** The Program is contingent in character and, therefore, no rights will vest in any individual participant under the Program until all conditions of the Program are satisfied and the amount of the individual awards are determined and actually paid by DHL."

(Boldface and italics in original.)

In late 2005, defendant merged with another company and, as part of that merger, a new shipping hub was opened in Ohio. The opening, according to plaintiff, caused a service disruption throughout defendant's delivery network, including the west coast, where plaintiff's district was located. Still, in the first two months of 2006, plaintiff met the incentive plan goals and received payments of $1,718. However, his March sales fell and, as a result, at the end of that month he had not met the goal for the first quarter.

Plaintiff's performance continued to slip, and in the second quarter he was ranked in the bottom 10 percent of the organization as measured by shipments per day (SPD) and revenue per day (RPD). Plaintiff was unable to bring his sales up and was issued two corrective actions based on his low ranking. Then, in July and August, plaintiff's sales increased to the extent that he repaid the deficit he had incurred in the first quarter, and, by the end of the second month, he was ahead of the incentive goals and on a pace to receive full third quarter payments totaling $5,778. However, he was terminated on September 18, before the end of the quarter.

This litigation ensued. The parties filed cross-motions for summary judgment. Defendant argued that the monthly QTD commission, although called a commission, was actually a bonus, and, under the employment contract, plaintiff had to be employed at the end of the quarter as a condition precedent to receiving it. Additionally, defendant argued that DHL had good cause to fire plaintiff for his low SPD and RPD ranking. Plaintiff responded that the monthly QTD commission was, as denominated, a commission and not a bonus; therefore, he argued, he had earned it as he worked

throughout the quarter and defendant owed it to him on a prorated basis after his termination. In the alternative, plaintiff argued that, if the court found that the payment was a bonus, then he had earned two-and-a-half months' worth of payments because the offer of the payment was a unilateral contract that he had partly performed before he was fired without good cause. The court denied defendant's motion and plaintiff's cross-motion.

Shortly before trial was scheduled to begin, defendant informed plaintiff that a key witness—Wolford, defendant's former Vice President of Sales—would have to testify by deposition before trial because defendant recently had learned that Wolford had been diagnosed with second-degree multiple sclerosis and he would be out of the country for treatment at the time of trial. The next day, defendant served plaintiff with the notice of perpetuation deposition, setting the deposition for March 31, 2008, to be held in California.

However, a few days before that deposition was scheduled to take place, defendant informed plaintiff that Wolford had cancelled it because he had to leave the country earlier than originally planned. Wolford offered to make himself available for a one-hour phone deposition on March 28. An amended notice of perpetuation deposition was served on March 25. Two days later, the parties appeared in circuit court on plaintiff's expedited motion seeking an order either prohibiting the perpetuation deposition from going forward or extending the hour-long time limitation. The trial court ruled:

"[I]t appears to me that I will go ahead and allow the deposition to take place at 10 o'clock on Friday morning. However, short of some other indication from [the witness], meaning a letter from his doctor or that he couldn't be available Saturday morning should the parties be able to fly down, I'm pretty uncomfortable simply taking this man's word that he's only available for an hour, when we know he's not leaving town until Monday.

"So I'm going to ask that you make arrangements to get something to the plaintiff that would allow them further information concerning his availability this weekend before he heads out of town."

Before the deposition, defendant provided plaintiff with a letter from Wolford's doctor stating that Wolford was "bedridden" and "unable to testify in any manner." Defendant also informed plaintiff that Wolford was leaving the country the day after the scheduled deposition and would therefore not be available for any further testimony. After defendant provided plaintiff with this information, plaintiff filed a discovery deposition notice for the night before the scheduled deposition, and defendant immediately filed a motion for a protective order to prevent that discovery deposition from taking place. The court granted defendant's protective order and barred plaintiff from taking the discovery deposition. The perpetuation deposition went forward, with the 60-minute time limitation. At trial, plaintiff argued that the perpetuation deposition did not conform to the trial court's requirements or, in the alternative, that it should not have been admitted because Wolford was not competent to testify. The trial court rejected plaintiff's arguments and allowed the deposition into evidence.

After a bench trial, the court concluded that plaintiff's employment was at-will and that, in order for his rights in the monthly QTD commission to have vested, plaintiff needed to have been employed on the last day of the quarter. The trial court also concluded that plaintiff did not prove that he was fired for lack of good cause and in bad faith. This appeal followed.

Plaintiff's first five assignments of error cluster around Wolford's deposition testimony. None requires extended discussion. We note preliminarily that plaintiff had the opportunity to cross-examine Wolford for 30 minutes at the perpetuation deposition. Further, plaintiff provides no specific description of anything that Wolford testified to that was prejudicial, nor any description of lines of questioning that plaintiff was precluded from conducting.

■ The first two assignments of error allege that the court should not have allowed perpetuation testimony over plaintiff's objection. Our standard of review is for abuse of discretion. *Doe v. Denny's, Inc.*, 146 Or App 59, 67, 931 P2d 816 (1997), *aff'd*, 327 Or 354, 963 P2d 650 (1998); *Farmers Ins. v. Hansen*, 46 Or App 377, 380, 611 P2d 696 (1980).

Under ORCP 39 I(3), if a party objects to the other party's perpetuation testimony, the party seeking perpetuation may overcome the objection by showing "undue hardship on the witness to appear at the trial or hearing" or "other good cause." Also "upon a showing of good cause," the court may allow the deposition to take place without the usual 14 days' notice. ORCP 39 I(4).

The trial court required defendant to (1) provide plaintiff with Wolford's contact information; (2) provide documentation for unavailability at trial and any medical limitations; and (3) demonstrate that Wolford would not be able to have his deposition taken at a later date. Defendant met those requirements before the perpetuation deposition. Among other things, it presented evidence from Wolford's physician that Wolford was suffering from an acute and newly discovered case of multiple sclerosis and needed to leave the country for treatment. It was within the trial court's discretion to conclude that those facts amounted to good cause and undue hardship. In allowing the perpetuation deposition, and allowing it on short notice, the court did not abuse its discretion.

■    Plaintiff next assigns error to the trial court's grant of defendant's motion for a protective order preventing plaintiff from taking the discovery deposition of Wolford prior to the perpetuation deposition. ORCP 39 I(5) provides that, "[t]o the extent that a discovery deposition is allowed by law, any party may conduct a discovery deposition of the witness prior to the perpetuation deposition." Plaintiff argues that, because there is no law preventing plaintiff from taking the discovery deposition, he should have been allowed to do so. Defendant counters that the trial court has discretion to protect witnesses, and the court acted within its discretion to grant defendant's protective order. We agree with defendant. ORCP 36 C applies to all matters of discovery and applies to the court's decision to deny plaintiff's protective order. ORCP 36 C allows a trial court to limit discovery in such a way to "protect a party or person from annoyance, embarrassment, oppression, or undue burden * * *," and allows the trial court to deny discovery altogether. It was within the court's discretion to grant defendant's protective order due to Wolford's

health issues and not allow a discovery deposition before the perpetuation deposition.

■ Finally, plaintiff argues that Wolford was not competent to testify because Wolford's doctor said Wolford was "unable to testify in any manner." OEC 601 provides, "Except as provided in [OEC 601] to [OEC 606], any person who, having organs of sense can perceive, and perceiving can make known the perception to others, may be a witness." The rule establishes a liberal standard for the competency of witnesses. *State v. Sullivan*, 217 Or App 208, 212, 174 P3d 1095 (2007), *rev den*, 344 Or 539 (2008) (quoting Laird C. Kirkpatrick, *Oregon Evidence* § 601.03(1), Art VI (4th ed 2002)). We review the trial court's determination of witness competency for an abuse of discretion. *Id.* In this case, although the doctor's note said Wolford was "unable to testify in any manner," this is not a legal conclusion, and Wolford testified during his deposition that his illness did not affect his memory. Therefore, it was within the trial court's discretion to admit the testimony, and we reject plaintiff's assignment of error.

■ We turn, then, to the merits. In his sixth assignment of error, plaintiff challenges the court's denial of his cross-motion for summary judgment. That denial is not reviewable. *Payless Drug Stores v. Brown*, 300 Or 243, 245-47, 708 P2d 1143 (1985) (denial of motion for summary judgment not reviewable unless the motion was based on purely legal issue); *Staten v. Steel*, 222 Or App 17, 23-27, 191 P3d 778 (2008), *rev den*, 345 Or 618 (2009). However, at trial, plaintiff presented the same arguments that the court rejected at the summary judgment stage, and the court rejected them again in its judgment. In his seventh through tenth assignments of error, plaintiff challenges those conclusions as reflected or stated in the judgment. As such, those conclusions *are* reviewable.

■ Plaintiff maintains that the QTD payments were in the nature of a commission, a form of wages that accrued throughout the quarter and of which, as a consequence, plaintiff could not lawfully be deprived. Defendant responds that the payments were a bonus that served the purpose of giving sales managers an incentive to reach quarterly goals and that plaintiff could not claim entitlement to the payment

until it could be determined whether he met that quarterly goal. We agree with defendant.

The label that attaches to the payments is relevant only insofar as it reflects a functional difference that has legal consequences. The ordinary and legal definitions of "commission" denote a payment that is a regular part of a salesperson's compensation, keyed to particular transactions.[1] As such, a commission is logically regarded as to have been earned at the time of the transaction to which it is keyed. A bonus, on the other hand, is a payment provided to an employee or partner in compensation for performance (either individual or enterprise) above and beyond what is usually expected.[2] There is nothing about a bonus which necessarily ties it to particular transactions.

With that understanding in mind, we conclude that the QTD payment was not a commission; more to the point, we conclude that, under the terms of the employment contract, it was not tied to particular transactions and not earned as those transactions occurred. Rather, it was a payment that was in addition to plaintiff's salary, contingent on his accomplishing a stated *quarterly* goal. The incentive plan states:

"Performance is measured on a quarter-to-date (QTD) basis and paid monthly. A discreet [*sic*] revenue *points* quota is set for every quarter. Results are based on performance against the quarterly target, prorated according to the number of QTD days.

"Monthly commission advances will be paid to you for the first and second month of the quarter for your achievement of between *95% to a maximum of 100%* of your monthly QTD target. Advances will be a prorated amount of

---

[1] *See Webster's Third New Int'l Dictionary* 457 (unabridged ed 2002) ("a fee paid to an agent or employee for transacting a piece of business or performing a service * * * *esp* : a percentage of the money received in a sale or other transaction paid to the agent responsible for the business"); *Black's Law Dictionary* 306 (9th ed 2009) ("A fee paid to an agent or employee for a particular transaction, usu. as a percentage of the money received from the transaction[.]").

[2] *See Webster's* at 252 ("something given or received that is over and above what is expected * * *[;] money or an equivalent given in addition to the usual compensation ‹surplus profits distributed among the workers as a bonus›"); *Black's* at 206 ("A premium paid in addition to what is due or expected ‹year-end bonus›.").

the quarterly commission amount as follows: 1/3 for the first month, 2/3 for the 2nd month less 1st month advance.

"Once eligibility and the payout amount are determined after the third month (end of quarter), you will be paid the balance of any earned commission (final earned QTD commission amount minus the first and second month advances). If your quarterly aggregate commission earned is less than the sum of the amounts paid to you in the first two months, the balance due the company will be recovered from future earnings."

(Emphasis in original.) Plaintiff's progress toward achieving the goal was *measured* on a monthly basis, and plaintiff was advanced a payment based on a projection of how that monthly progress would translate into a quarterly total, but the advance was unambiguously contingent. Only the quarterly total was relevant to the final determination of payment. It follows that payments were not keyed to particular transactions and remained unearned until the quarter ended. Thus, plaintiff's first claim—that defendant owed him a payment before the end of the quarter because he had already earned it—cannot be squared with the terms of the employment contract, regardless of the fact that the contract refers to the payment as a commission.

■ In the alternative, plaintiff contends that, even if the payment was a quarter-end "bonus," he was entitled to at least part of it under the theory that the incentive plan was a unilateral contract that he had partially performed. Plaintiff relies primarily on *Thompson v. Burr*, 260 Or 329, 490 P2d 157 (1971). Defendant maintains that the Supreme Court modified *Thompson* and rejected an argument similar to plaintiff's in *State ex rel Roberts v. Public Finance Co.*, 294 Or 713, 662 P2d 330 (1983). We conclude, however, that plaintiff loses under either case.

In *Thompson*, the plaintiff employee and the defendant employer had an agreement that the plaintiff would receive a bonus of 10 percent of a calendar year's earnings if the he was still employed by the defendant on April 1 of the following year. The plaintiff worked through all of calendar year 1968 and was terminated in March 1969. The defendant denied payment of the bonus because the plaintiff was not

employed on April 1, 1969. The plaintiff sued. The trial court ruled in the plaintiff's favor and the Supreme Court affirmed, ruling that the bonus agreement constituted a unilateral contract and explaining:

"There is ample authority to the effect that where the payment of a bonus is a matter of contract (as in this case), rather than a gratuity, such an agreement by an employer to pay a bonus to an employee may not be defeated by the employer by discharging the employee shortly before he has completed his eligibility for the bonus unless the discharge was for 'good cause' and that if such an employee is discharged 'without good cause' he is still entitled to payment of the bonus even if the employer did not act in bad faith."

*Thompson*, 260 Or at 334-35. Plaintiff contends that he, like the plaintiff in *Thompson*, accepted the offer of a unilateral contract and defendant cannot escape its obligation to pay him by terminating him without good cause before the end of the quarter.

Defendant points out, however, that there is an important difference between *Thompson* and this case: In *Thompson*, the plaintiff worked for the entire period on which the bonus was based (calendar year 1968), whereas plaintiff here was terminated before completing the bonus period. Defendant also contends that, to the extent *Thompson* held that a bonus offer establishes a unilateral contract that an employee accepts by beginning service, that holding was modified in *Public Finance Co*. In that case, the employment contract stated that the employee could earn vacation days only if the employee was still employed on his anniversary date. 294 Or at 715. His employment ended three days before the anniversary date when the employer sold his business. The Supreme Court concluded that, although the bonus plan was "somewhat like a unilateral contract," there were crucial distinctions:

"It is true that this plan offering vacation pay is somewhat like a unilateral contract, in that the employer would not have the power to alter the conditions or rescind the original offer in the middle of the year, if the employee remained on the job because of the original offer. However, as we said in *Walker v. American Optical Corp.*, 265 Or 327, 330, 509 P2d 439 (1973), concerning a unilateral contract

for a bonus, it does not follow that just because this is a unilateral contract the employee automatically becomes entitled to the additional compensation by remaining employed for part of the contract period. There, as here, the employer's obligation to pay the compensation arises only on the occurrence of the condition precedent as described in the contract. In both cases, the condition precedent is the employee's employment on a certain named day."

*Id.* at 718 (footnote omitted). Defendant suggests that the categorical language in *Public Finance Co.* dispenses with the "good cause" requirement; if the employment contract is "at will," the employer can terminate the employee before the "vesting" date for any reason at all.

We need not decide in this case the extent to which *Public Finance Co.* dispenses with the good cause requirement or modifies the unilateral contract theory. Even if plaintiff is correct in his reading of *Public Finance Co.* and *Thompson*—that is, even if he is correct that he could not be terminated without good cause and that being employed on the vesting date is not a condition precedent—he still loses. That is so because, regardless of whether the bonus is partially earned by part performance or earned only if the employee fulfills the condition precedent of being employed on the vesting date, under neither theory does the employee qualify for the bonus if he or she is terminated for cause. Neither *Thompson* nor *Public Finance Co.*, nor any other case that plaintiff cites or that we have found, holds or suggests that an employer must pay all or part of a bonus if the employee *is* terminated for good cause.

In the present case, after the court denied cross-motions for summary judgment, the issue of good cause was tried to the court, and the court decided that plaintiff had not met his burden of showing that he was terminated *without* good cause. In this context, "good cause" has been defined as a "good faith determination of a sufficient cause for discharge based on facts reasonably believed to be true and not for any arbitrary, capricious, or illegal reason." *Simpson v. Western Graphics*, 293 Or 96, 99, 643 P2d 1276 (1982); *accord Mobley v. Manheim Services Corp.*, 133 Or App 89, 94, 889 P2d 1342, *rev den*, 321 Or 47 (1995) ("[T]here must be some evidence of

the existence of facts justifying the termination."). The relevant undisputed fact is that plaintiff was terminated due to his poor performance on two measures of achievement: Sales Per Day (SPD) and Revenue Per Day (RPD). On both of those measures, plaintiff was in the lowest decile among all managers. Plaintiff contends that (1) other measures were more accurate and appropriate, (2) his SPD and RPD numbers were adversely and disproportionately affected by the hub disaster at company headquarters in Ohio for which he bore no responsibility, and (3) other managers with equally bad numbers were not terminated. Regarding the first of those arguments, we are unwilling to substitute our judgment for the employer's. Regarding the second and third, suffice it to say that they take issue with findings of fact and that defendant presented evidence supporting a position contrary to plaintiff's. The court was not persuaded ("The court is not convinced by a preponderance of the evidence that plaintiff's termination was done without good cause and/or in bad faith.") and its finding is supported by constitutionally adequate evidence.

In sum, the payment to which plaintiff claims entitlement in this case was a bonus that he would have earned only if he had completed his final quarter of employment or if he had been terminated without good cause before the end of that period. He did not complete the period, and he was terminated for good cause. The trial court did not err.

Affirmed.