SHORR, J.
*649 Plaintiffs, Sarah Meyer and Martin Wooldridge, appeal from a general judgment dismissing their action against defendants Oregon State Lottery (the Lottery), Jill Goldsmith, Larry Niswender, Tessa Sugahara, John Kroger, and Craig Durbin.[1] Plaintiffs *94 assert five assignments of error. We reject plaintiffs' fourth assignment of error without written discussion and write only to address their remaining assignments. First, plaintiffs assign error to the trial court's dismissal of their 42 USC section 1983 claims for failure to state a claim. Second, plaintiffs assign error to the trial court's dismissal of their claim for intentional interference with an economic relationship for failure to state a claim. Third, they assign error to the trial court's denial of their motions to compel production of certain documents created by Goldsmith during the two investigations that she conducted. Finally, in their fifth assignment of error, plaintiffs assert that the trial court erred in granting defendants' summary judgment motion as to plaintiffs' federal and state retaliation claims.[2] As explained below, we reject plaintiffs' second and third assignments. However, with respect to their first assignment of error, we conclude that the trial court erred in dismissing plaintiffs' section 1983 claim alleging that Niswender and Sugahara violated their right to intimate association. Further, with respect to the fifth assignment of error, we conclude that the trial court erred in granting defendants' motion for summary judgment on certain aspects of plaintiffs' retaliation claims. As a result, we reverse and remand as to those claims and otherwise affirm.
I. FACTUAL AND PROCEDURAL HISTORY
We begin with a summary of the facts and procedural history. The relevant acts in this case occurred *650 between 2008 and 2011. Plaintiffs, who were involved in an extramarital romantic relationship, were both managers for the Lottery. Because of anonymous complaints received from various employees regarding their relationship and how it affected their work, the Lottery opened an investigation into plaintiffs' department and, specifically, into plaintiffs themselves. Goldsmith, an outside investigator hired by the Oregon Department of Justice (DOJ), performed the investigation. Sugahara, as an attorney for DOJ, oversaw the investigation. Kroger was the Attorney General at the time of the investigation.
During the pendency of that investigation, Niswender, the Lottery's then director, placed plaintiffs on administrative leave with pay. After being placed on leave, Meyer filed a complaint with the Lottery's human resources department alleging that Niswender had previously sexually harassed her and other women and that the investigation and her placement on administrative leave were in retaliation for her resistance to his sexual advances. A concurrent investigation into Meyer's allegations was also held. Goldsmith also conducted that investigation.
At the conclusion of both investigations, Durbin, the Lottery's Assistant Director for Security, issued plaintiffs disciplinary letters and allowed plaintiffs to return to work subject to increased supervision. Plaintiffs obtained Goldsmith's report regarding plaintiffs' department, but were never given a copy of Goldsmith's report regarding the investigation of Meyer's allegations against Niswender. Plaintiffs were given the opportunity to have a "name-clearing" hearing before the Lottery board in a public meeting; however, plaintiffs never took advantage of that opportunity. Sometime later, a copy of Goldsmith's report regarding plaintiffs' department was released to the media in response to a public records request.
Plaintiffs subsequently filed the current action against defendants, asserting seven claims for relief. Three of those claims are relevant on appeal. They are (1) a claim that the Lottery unlawfully retaliated against plaintiffs because they engaged in protected conduct; (2) claims under section 1983 alleging that (a) Niswender and Sugahara *651 violated plaintiffs' right to equal protection, (b) Kroger failed to adequately train Sugahara, (c) Niswender, Sugahara, and Kroger violated plaintiffs' right to substantive and procedural due process, and (d) Niswender *95 and Sugahara violated plaintiffs' right to freedom of association; and (3) a claim that Niswender intentionally interfered with plaintiffs' economic relationship with the Lottery.
Defendants responded with a motion to dismiss the section 1983 claims and the intentional interference with an economic relationship claim for failure to state a claim. Defendants also moved to dismiss Niswender, Sugahara, Kroger, and Durbin from the complaint. The trial court agreed and dismissed those claims and those defendants. Discovery proceeded on plaintiffs' remaining claims, during which plaintiffs sought Goldsmith's report regarding her investigation of Meyer's complaint against Niswender, as well as the notes and documents that Goldsmith collected during both investigations. The remaining defendants refused to turn over those documents, and the trial court denied plaintiffs' multiple motions to compel production of those documents.
At the conclusion of discovery, the remaining defendants sought summary judgment on plaintiffs' remaining sexual discrimination and retaliation claims. After a hearing, the trial court granted summary judgment to defendants.
II. ANALYSIS
As noted, we discuss four of the plaintiffs' assignments of error. Because those assignments involve different facts and law and are also subject to varying standards of review, we address each of them in turn below.
A. 42 USC section 1983 Claims
In their first assignment, plaintiffs argue that the trial court erred when it dismissed, under ORCP 21 A(8), the section 1983 claims for failure to state ultimate facts that constitute a claim.
Plaintiffs explicitly alleged three claims for relief against defendants under section 1983 : equal protection, *652 substantive due process, and failure to train. Plaintiffs also argued before the trial court and us that they intended to plead (and their complaint contains at least some text alleging) claims for violations of their right to procedural due process and their right to freedom of association. Before the trial court, defendants also treated plaintiffs' complaint as containing claims for violations of their right to procedural due process and freedom of association.
Defendants filed a motion to dismiss the section 1983 claims under ORCP 21 A(8), arguing that none of the claims alleged by plaintiffs assert a federal constitutional or statutory right that was violated and that, even if they did, defendants were entitled to qualified immunity on those claims, because none of those rights were clearly established. In response, plaintiffs argued that they did allege violations of clearly established constitutional rights. The trial court agreed with defendants and dismissed all of plaintiffs' section 1983 claims.[3]
When reviewing a trial court's decision to dismiss a claim under ORCP 21 A(8), we must determine if the "complaint * * * contain[s] factual allegations that, if proved, establish the right to the relief sought." Moser v. Mark , 223 Or. App. 52, 57, 195 P.3d 424 (2008). When undertaking that task, we assume "all well-pleaded facts" in the complaint "are true and give plaintiff[s] the benefit of all favorable inferences that reasonably may be drawn from those factual allegations." Skille v. Martinez , 288 Or. App. 207, 209-10, 406 P.3d 126, adh'd to as modified on recons , 289 Or. App. 637, 407 P.3d 998 (2017) (internal quotation marks omitted).
*96 As noted, the claims at issue were brought under section 1983, which provides:
*653 "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."
"To state a claim for relief in an action brought under [ section] 1983, [plaintiffs] must establish that they were deprived of a right secured by the Constitution or laws of the United States, and that the alleged deprivation was committed under color of state law." American Mfrs. Mut. Ins. Co. v. Sullivan , 526 U.S. 40, 49-50, 119 S.Ct. 977, 143 L.Ed. 2d 130 (1999).
In this case, the trial court concluded that plaintiffs did not allege any constitutional or statutory violations and, thus, they failed to allege ultimate facts that, if proved, established a claim for relief. For the reasons stated below, we conclude that the trial court only erred in dismissing plaintiffs' freedom of association claim. Accordingly, we reverse and remand as to that claim and otherwise affirm.
1. Equal protection
In their section 1983 claim against Niswender and Sugahara, plaintiffs alleged that their right to equal protection under the Fourteenth Amendment to the United States Constitution had been violated.
The Fourteenth Amendment provides, in part, that "[n]o State shall * * * deny to any person within its jurisdiction the equal protection of the laws." In some situations, courts have allowed plaintiffs to proceed when they allege an equal protection violation based on a "class of one"-i.e. , "where the plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." Village of Willowbrook v. Olech , 528 U.S. 562, 564, 120 S.Ct. 1073, 145 L.Ed. 2d 1060 (2000). However, "the class-of-one theory of equal protection has no application in the public employment context."
*654 Engquist v. Oregon Dept. of Agriculture , 553 U.S. 591, 607, 128 S.Ct. 2146, 170 L.Ed. 2d 975 (2008). As a result, to assert a claim that their right to equal protection was violated, plaintiffs cannot merely allege that they were "arbitrarily treated differently from other similarly situated employees, with no assertion that the different treatment was based on [their] membership in any particular class." Id. at 594, 128 S.Ct. 2146.
In this case, plaintiffs alleged only a "class-of-one" (or, in this case, arguably a class-of-two) equal protection violation. They did not allege that they were treated differently because of their membership in any particular class. Instead, they merely asserted that they were treated differently from "similarly situated persons" because of their association with one another without a basis in "legitimate public policy." Without an allegation that plaintiffs were members of a "distinct group[ ] of individuals," under Engquist , plaintiffs failed to state a claim for a violation of their constitutional right to equal protection. 553 U.S. at 605, 128 S.Ct. 2146. Consequently, the trial court did not err in dismissing plaintiffs' section 1983 equal protection claim.
2. Failure to train
With respect to plaintiffs' section 1983 claim for "failure to train" against Kroger, failure to train a subordinate may serve as the basis for a section 1983 claim only where the failure to train amounts "to deliberate indifference to the rights of persons with whom" the subordinate came into contact. Connick v. Thompson , 563 U.S. 51, 61, 131 S.Ct. 1350, 179 L.Ed. 2d 417 (2011) (internal quotation marks omitted; emphasis added).
In support of their claim for "failure to train," plaintiffs alleged that
"Kroger failed to train and/or supervise Assistant Attorney General Tessa Sugahara to cause and facilitate an objective investigation by an objective investigator *97 and negligently retained a contracted investigator, who was not qualified to investigate management practices."
Those allegations are insufficient to state a claim under section 1983 because they contain no ultimate facts that, if proved, would indicate that Kroger's failure to train *655 Sugahara was the result of "deliberate indifference to the rights" of persons with whom Sugahara came into contact. Connick , 563 U.S. at 61, 131 S.Ct. 1350 (internal quotation marks omitted). Consequently, the trial court did not err in dismissing plaintiffs' "failure to train" claim.
3. Procedural and substantive due process
In their section 1983 procedural and substantive due process claims against Niswender, Sugahara, and Kroger, plaintiffs alleged that they were wrongly subjected to an unwarranted investigation into their employment and forced to take paid administrative leave during that investigation. Further, they alleged that they were wrongly given disciplinary letters indicating that they could return to work but would be subjected to more intense supervision. Plaintiffs also alleged that, during this process, Sugahara "denied * * * plaintiffs an opportunity to learn of any allegations against them, in violation of Oregon law and Lottery policy that required notice of allegations within 7 days of any suspension and an opportunity to clear their name before publicizing the report." Finally, plaintiffs alleged that Sugahara conspired with defendants Goldsmith and Niswender "to produce a deliberately fabricated, misleading and false investigation report and engaged in actions to coerce * * * plaintiffs into returning the investigation reports (their own personnel records) by threatening to make the records public and then disclosing the reports in violation of Official Misconduct statutes."
To establish either a substantive or procedural due process violation, plaintiffs must first show that they were deprived of a constitutionally protected liberty or property interest. See Board of Regents v. Roth , 408 U.S. 564, 569, 92 S.Ct. 2701, 33 L.Ed. 2d 548 (1972) (noting that "[t]he requirements of procedural due process apply only to the deprivation of interests encompassed by the Fourteenth Amendment's protection of liberty and property"). Thus, to state a claim under section 1983 on a due process theory, a plaintiff "must begin by establishing that [he or she] had either a property or a liberty interest meriting constitutional protection." Wheaton v. Webb-Petett , 931 F.2d 613, 615 (9th Cir. 1991). Plaintiffs failed to plead that they had either.
*656 First, as federal appellate courts have explained, being placed on paid administrative leave during an investigation and being given a disciplinary letter does not implicate a constitutionally protected property interest absent a showing that plaintiffs suffered "loss of employment," "demotion," "loss of salary," or "loss of benefits." See Piscottano v. Murphy , 511 F.3d 247, 288 (2d Cir. 2007) (holding that no property interest was harmed when a plaintiff was placed on fully paid leave during an investigation, was issued a formal disciplinary letter advising him that he would be subject to increased discipline if he violated the terms of his employment again, and did not suffer "loss of employment," "demotion," "loss of salary," or "loss of benefits"); see also Pitts v. Board of Educ. of U.S.D. 305, Salina, Kansas , 869 F.2d 555, 556 (10th Cir. 1989) ("While suspension of a public employee without pay may infringe upon a property right, the two-day suspension with pay did not deprive Pitts of any measurable property interest." (Emphasis in original; internal citation omitted.)). Here, plaintiffs did not allege that they had suffered any loss of employment, demotion, loss of salary, or loss of benefits.
Similarly, plaintiffs did not plead that defendants violated a constitutionally protected liberty interest. On appeal, plaintiffs argue, as they did to the trial court, that they had a liberty interest in not having their reputation damaged by the release of the report detailing their allegedly fabricated employee misconduct. However, "so long as * * * damage flows [only] from injury caused by the defendant to a plaintiff's reputation," rather than from some other more tangible harm, that damage "may be recoverable under state tort law but is not recoverable"
*98 as a protected liberty interest. Siegert v. Gilley , 500 U.S. 226, 234, 111 S.Ct. 1789, 114 L.Ed. 2d 277 (1991), reh'g den. , 501 U.S. 1265, 111 S.Ct. 2920, 115 L.Ed.2d 1084 (1991), overruled in part on other grounds by Pearson v. Callahan , 555 U.S. 223, 129 S.Ct. 808, 172 L.Ed. 2d 565 (2009) ; see also Lincoln Loan Co. v. City of Portland , 158 Or. App. 574, 583 n. 11, 976 P.2d 60 (1999), rev den , 330 Or. 138, 6 P.3d 1098, cert. den. , 531 U.S. 1013, 121 S.Ct. 570, 148 L.Ed.2d 488 (2000) (noting that, "by themselves, reputational interests are not 'liberty' interests within the meaning of the Due Process Clause and do not merit due process protections" (internal quotation marks omitted));
*657 Krainski v. Nevada ex rel. Bd. of Regents of Nevada System of Higher Educ. , 616 F.3d 963, 971 (9th Cir. 2010), cert. den. , 562 U.S. 1286, 131 S.Ct. 1678, 179 L.Ed.2d 615 (2011) (same). Plaintiffs did not allege some more tangible interest attached to their reputational harm. Consequently, they failed to allege a liberty interest meriting constitutional protection.
Accordingly, plaintiffs failed to assert ultimate facts constituting a claim for violation of their right to either substantive or procedural due process. Consequently, the trial court did not err in dismissing those section 1983 claims.
4. Freedom of association
Finally, with respect to plaintiffs' claim that Niswender and Sugahara violated plaintiffs' right to freedom of association under the First Amendment to the United States Constitution, we conclude that the trial court erred when it determined that plaintiffs did not plead a constitutional violation against those defendants. Because we also conclude that those defendants were not entitled to qualified immunity, the trial court erred in dismissing plaintiffs' freedom of association claim. As discussed below, we therefore reverse the trial court's dismissal of that claim against Niswender and Sugahara, but affirm its dismissal of that claim against the other individual defendants because the court correctly concluded that plaintiffs failed to plead any ultimate facts stating such a claim against those other defendants.
In support of their freedom of association claim, plaintiffs pleaded that they "had a right to associate with each other," that "[t]here was no state or Lottery policy against their association," and that there was "no evidence that their relationship had ever disrupted the workplace." Plaintiffs then alleged that the Lottery continued its investigation, suspended, and ultimately disciplined plaintiffs "because of their legal association." We note that, in another part of their complaint, plaintiffs implicitly admit that the Goldsmith investigation was at least initially based on plaintiffs' relationship's potential effect on their work environment. However, plaintiffs also alleged that, regardless, "Niswender did not end the investigation when it became apparent that initial concerns were not supportable or were *658 discriminatory" and that, instead, he "suspended the plaintiffs and expanded the scope of the investigation to try and find anything that might serve to justify plaintiffs' termination or cause their resignations."
As noted, the individual defendants moved to dismiss the entire fourth claim for relief, including the freedom of association claim. With respect to that particular claim, those defendants contended, first, that they were entitled to qualified immunity and, next, that the complaint improperly alleged conclusions of law instead of ultimate facts. The trial court agreed and dismissed the claim. The parties reassert their arguments made before the trial court, and we take each of those arguments in turn.
"The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Pearson , 555 U.S. at 231, 129 S.Ct. 808 (internal quotation marks omitted). To determine if a government official is protected by qualified immunity, we must "decide whether the facts that a plaintiff has alleged * * * make out a violation of a constitutional right" and, if so, "whether the right at issue was clearly established at the time of defendant's alleged misconduct."
*99 Id. at 232, 129 S.Ct. 808 (internal citations and quotation marks omitted).
Plaintiffs argue that they adequately asserted a violation of their constitutional right to intimate association. See, e.g. , Schowengerdt v. General Dynamics Corp. , 823 F.2d 1328, 1336 (9th Cir. 1987) (holding that "the Constitution prohibits unregulated, unrestrained employer inquiries into personal sexual matters that have no bearing on job performance" (internal quotation marks omitted)). We conclude that plaintiffs have alleged a constitutional violation. While neither the United States Supreme Court nor Oregon courts have ruled on the issue, the Ninth Circuit Court of Appeals has concluded that a government employer "can violate its employees' rights to privacy and intimate association either by impermissibly investigating their private sexual conduct or by taking adverse employment action on the basis of such private conduct."
*659 Perez v. City of Roseville , 882 F.3d 843, 857 (9th Cir. 2018). In the Ninth Circuit, an investigation and resulting employment decision based on a government employee's private sexual conduct is impermissible when there is no evidence that that conduct affected "on-the-job performance." Thorne v. City of El Segundo , 726 F.2d 459, 471 (9th Cir. 1983), cert. den. , 469 U.S. 979, 105 S.Ct. 380, 83 L.Ed.2d 315 (1984) ( Thorne I ).
Of course, we are not bound by the decisions of the Ninth Circuit. Beason v. Harcleroad , 105 Or. App. 376, 382, 805 P.2d 700 (1991). However, in this case, we find persuasive the Ninth Circuit's reasoning supporting their conclusion that the constitutional right to intimate association protects government employees' right to be free from impermissible investigations and intrusions into their private sexual conduct. See Schowengerdt , 823 F.2d at 1336 (concluding that a government naval employee had a constitutional right to be free from "unnecessary, overbroad, or unregulated employer investigations into his sexual practices"). Accordingly, we conclude that a government employer violates its employees' right to intimate association by impermissibly investigating their private sexual conduct or taking adverse employment action based on that conduct.
Here, plaintiffs adequately pleaded a violation of the above stated right. As noted, plaintiffs pleaded that defendants continued to investigate, suspended, and ultimately disciplined them because of their out-of-work relationship and that "[t]here was no state or Lottery policy against their association" or "evidence that their relationship had ever disrupted the workplace." Those allegations, if proven, are enough to sustain a claim that the Lottery violated plaintiffs' right to intimate association by impermissibly investigating their private sexual conduct and taking adverse employment actions based on that conduct.
Defendants argue that Perez and Thorne I are inapt because, as plaintiffs alleged in the complaint, the disciplinary investigation at issue was originally initiated based on concerns that plaintiffs' relationship had led them to violate agency policy. However, defendants' argument ignores that plaintiffs also alleged that the adverse employment actions taken against them occurred "when it became apparent that the initial concerns [regarding on-the-job *660 performance] were not supportable." If the Lottery's workplace concerns became unsupportable, as plaintiffs allege-as we must assume that was the case under our standard of review-the Lottery's continued investigation and other adverse employment actions taken after that point would have been undertaken "[i]n the absence of any showing that" plaintiffs' relationship "ha[d] an impact upon [plaintiffs'] on-the-job performance," bringing this case under Perez and Thorne I . Thorne I , 726 F.2d at 471. As a result, plaintiffs alleged a constitutional violation.
Defendants correctly point out that, even if plaintiffs pleaded a violation of their constitutional rights, defendants are still entitled to prevail under a theory of qualified immunity if the constitutional right that plaintiffs allege was violated was not a "clearly established * * * right[ ] of which a reasonable person would have known" at the time of the alleged violation. Pearson , 555 U.S. at 231, 129 S.Ct. 808 (internal quotation marks omitted). Because the trial court concluded that there was no constitutional violation, it did not reach that second part of the qualified immunity *100 test. We nevertheless decide to reach that issue because, as it is the second part of a two-part test, it is almost certain to arise on remand in the trial court. See, e.g. , Friends of Yamhill County v. Board of Commissioners , 237 Or. App. 149, 172, 238 P.3d 1016 (2010), aff'd , 351 Or. 219, 264 P.3d 1265 (2011) (reviewing an issue because "there is some likelihood that the question * * * will continue to be an issue on remand in th[e] case and to obviate further, unnecessary appeals on" that issue).
Turning to that second prong of the qualified immunity test, "[a] government official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." Ashcroft v. al-Kidd , 563 U.S. 731, 741, 131 S.Ct. 2074, 179 L.Ed. 2d 1149 (2011) (internal quotation marks and brackets omitted). No case needs to be directly on point, "but existing precedent must have placed the statutory or constitutional question beyond debate." Id. A legal proposition is beyond debate when, at the time of the allegedly unconstitutional actions, "either controlling authority or *661 a robust consensus of cases of persuasive authority" exist establishing the rule of law upon which the plaintiff seeks to rely. Plumhoff v. Rickard , 572 U.S. 765, 134 S.Ct. 2012, 2023, 188 L.Ed. 2d 1056 (2014) (internal quotation marks omitted).
Here, plaintiffs contend that their right to be free from undue influence in their relationship was established at the relevant time by "controlling authority," namely the Ninth Circuit's decision in Thorne I . As discussed below, we agree.
We pause to address an issue that is not settled by the United States Supreme Court, which is whether a federal circuit court decision is "controlling authority" within the states in the circuit for qualified immunity purposes. The Court has "not yet decided what precedents-other than [their] own-qualify as controlling authority for purposes of qualified immunity." District of Columbia v. Wesby , --- U.S. ----, 138 S.Ct. 577, 591 n. 8, 199 L.Ed. 2d 453 (2018). Indeed, it has consistently avoided the issue, so we do not yet have direction from that court. See, e.g. , Kisela v. Hughes , --- U.S. ----, 138 S.Ct. 1148, 1153, 200 L.Ed. 2d 449 (2018) (assuming without deciding that "a controlling circuit precedent could constitute clearly established law"); Reichle v. Howards , 566 U.S. 658, 665-66, 132 S.Ct. 2088, 182 L.Ed. 2d 985 (2012) (same).
However, the underlying question regarding whether a constitutional right is clearly established for qualified immunity purposes is whether the law was "sufficiently clear" at the time of the government official's allegedly unlawful conduct "that every reasonable official would understand that what he is doing" is unlawful. Ashcroft , 563 U.S. at 741, 131 S.Ct. 2074 (internal quotation marks and brackets omitted). Addressing that question in the context of what constitutes controlling authority for qualified immunity purposes, we conclude that, when the federal circuit in which the government official acts has clearly established that the official's actions were unlawful at the time of those actions, every reasonable official in that jurisdiction "would understand that what he is doing" is unlawful. Id. The Ninth Circuit follows the same rule. See, e.g. , Perez , 882 F.3d at 856-57 ("We *662 reaffirm that, for purposes of qualified immunity, a Ninth Circuit precedent is sufficient to clearly establish the law within our circuit."). Absent such a rule, a government official could ignore clear circuit court authority in her state and would be free to continue to ignore that law until, if ever, the Supreme Court accepted the issue for review.
In Thorne I , the Ninth Circuit clearly established within the states comprising that circuit that,
"[i]n the absence of any showing that the private, off-duty, personal activities of the type protected by the constitutional guarantees * * * of free association have an impact upon * * * on-the-job performance, and of specific policies with narrowing implementing regulations, we hold that reliance on these private non-job related considerations by the state in rejecting an applicant for employment violates the applicant's protected constitutional interests *101 and cannot be upheld under any level of scrutiny."
726 F.2d at 471. As the Ninth Circuit itself later concluded, Thorne I established that an employer
"can violate its employees' rights to privacy and intimate association either by impermissibly investigating their private sexual conduct or by taking adverse employment action on the basis of such private conduct."
Perez , 882 F.3d at 857 ; see also Thorne v. City of El Segundo , 802 F.2d 1131, 1139 (9th Cir. 1986) ( Thorne II ) ("Thorne established in this circuit that the Constitution prohibits unregulated, unrestrained employer inquiries into personal, sexual matters that have no bearing on job performance.").
Thorne I was decided in 1983, and its rule was reaffirmed in 1986 in Thorne II . The relevant conduct in this case occurred between 2008 and 2011. As a result, at the time that the events in this case occurred, the constitutional right that plaintiffs alleged was violated was clearly established for government actors acting in the states within the Ninth Circuit.
We recognize that a circuit split exists regarding what types of off-duty romantic relationships are constitutionally protected in the government employer context. Compare Thorne I , 726 F.2d at 471 (protecting all "off-duty, *663 personal activities of the type protected by the constitutional guarantees of privacy and free association" that do not "have an impact upon an applicant's on-the-job performance," including, as relevant to both this case and Thorne I , extramarital relationships), with Gaspers v. Ohio Dept. of Youth Services , 648 F.3d 400, 413 (6th Cir. 2011) (stating that extramarital relationships were not protected under the Sixth Circuit law), and Matusick v. Erie County Water Authority , 757 F.3d 31, 61 (2d Cir. 2014) (holding that, prior to Matusick and in the qualified immunity context, whether relationships other than marriages were constitutionally protected was not clearly established and, thus, that the government employer was entitled to qualified immunity).[4] Further, we also recognize that the Court has stated that, where "judges * * * disagree on a constitutional question, it is unfair to subject" government actors "to money damages for picking the losing side of the controversy." See, e.g. , Pearson , 555 U.S. at 245, 129 S.Ct. 808 (internal quotation marks omitted).
However, none of the cases where the Supreme Court has made those statements discuss the effect of a circuit split where, as here, the law that existed in the parties' jurisdiction at the time that the actions in the case took place clearly established the constitutional right that the plaintiffs in those cases alleged was violated. Instead, those cases were decided in the absence of preexisting law from the parties' jurisdiction indicating the alleged right was clearly established at the time of the alleged violation. See, e.g. , Pearson , 555 U.S. at 244-45, 129 S.Ct. 808 (concluding that a constitutional right was not clearly established where "judges * * * disagree[d] on a constitutional question" and, prior to the decision that was on appeal, no court of appeals had concluded that the constitutional right that the plaintiff alleged was violated existed); Safford Unified School Dist. #1 v. Redding , 557 U.S. 364, 378-79, 129 S.Ct. 2633, 174 L.Ed. 2d 354 (2009) (concluding that a constitutional right was not clearly established where there were "disuniform views of the law in the other federal, or state, courts," courts had *664 interpreted states' supreme court precedent differently, and, prior to the Ninth Circuit's decision in that case, the circuit had not concluded that a constitutional right was violated in a situation similar to the one on appeal); Wilson v. Layne , 526 U.S. 603, 617-18, 119 S.Ct. 1692, 143 L.Ed. 2d 818 (1999) (holding that a constitutional right was not clearly established where "judges * * * disagree[d] on a constitutional question" and "[p]etitioners ha[d] not brought to [the Court's] attention any cases of controlling authority in their jurisdiction at the time of the incident"). *102 Absent controlling United States Supreme Court authority indicating that a circuit split overcomes controlling law from the relevant jurisdiction, we conclude that the Ninth Circuit's decision in Thorne I constitutes "controlling authority" in this case, and that the right plaintiffs allege was clearly established at the time of the events in this case.
Plaintiffs alleged the violation of a constitutional right to the extent that they allege that Niswender and Sugahara continued to pursue an investigation of plaintiffs' personal out-of-work relationship after they allegedly concluded that that relationship had no effect on their work and later suspended and disciplined them for that personal relationship. The right in question was clearly established at the relevant time. As a result, Niswender and Sugahara were not entitled to qualified immunity.
Separately, the trial court also dismissed plaintiffs' freedom of association claim as to all individual defendants because it concluded that plaintiffs had alleged only conclusions of law and not ultimate facts. At least insofar as plaintiffs alleged claims against Niswender and Sugahara, we disagree.
ORCP 18 A requires that pleadings contain "[a] plain and concise statement of the ultimate facts constituting a claim for relief without unnecessary repetition." In determining the sufficiency of the complaint, "we accept all well-pleaded allegations of the complaint as true and give plaintiff the benefit of all favorable inferences that may be drawn from the facts alleged." Fearing v. Bucher , 328 Or. 367, 371, 977 P.2d 1163 (1999). Here, as we discuss above, *665 accepting all well-pleaded allegations as true, the complaint does contain sufficient ultimate facts to support plaintiffs' freedom of intimate association claim against Niswender and Sugahara. Plaintiffs alleged that those defendants subjected plaintiffs to "suspension," "expanded investigation," "more intense supervision," and "the publication of the investigation report about the plaintiffs" based on their intimate association after "it became apparent that initial concerns [regarding on-the-job performance] were not supportable." However, the complaint does not contain similar factual allegations against the other individual defendants. As a result, we reverse the trial court's dismissal of the freedom of association claim against Niswender and Sugahara, but affirm as to its dismissal of that claim against the other individual defendants because the trial court correctly concluded that plaintiffs failed to plead any ultimate facts stating such a claim against those other defendants.
B. Intentional Interference with an Economic Relationship Claim
In their second assignment of error, plaintiffs assert that the trial court erred in granting defendants' motion to dismiss plaintiffs' claim against Niswender for intentional interference with an economic relationship. The trial court dismissed that claim for failure to state ultimate facts that constitute a claim. ORCP 21 A(8).
As we previously noted, when reviewing a trial court's decision to dismiss a claim under ORCP 21 A(8), our duty is to determine if the "complaint * * * contain[s] factual allegations that, if proved, establish the right to the relief sought." Moser , 223 Or. App. at 57, 195 P.3d 424. We assume "all well-pleaded facts" in plaintiffs' complaint "are true and give plaintiff the benefit of all favorable inferences that reasonably may be drawn from those factual allegations." Skille , 288 Or. App. at 209-10, 406 P.3d 126 (internal quotation marks omitted). Consistent with that standard, we state the following facts.
In their first amended complaint, relevant to their claim for intentional interference with an economic relationship, plaintiffs alleged that they each had been employed by the Lottery for over 10 years. Further, they alleged that, when Niswender, as director of the Lottery, made the *666 decision to "investigate, suspend, withhold allegations justifying the suspension, extend the suspension and discipline the plaintiffs," he "did not act for any benefit of the state." Plaintiffs alleged that, instead, Niswender subjected plaintiffs to investigation, suspension, and discipline "solely for personal reasons"-i.e. , his alleged resentment of Meyer's resistance to his sexual advances, his resentment of plaintiffs' relationship, his resentment of plaintiffs' "assertion *103 of rights," and to cover up the results of the investigation into the allegations of sexual harassment and retaliation against himself. Plaintiffs did not allege, however, that they suffered any economic injury as a result of Niswender's actions and, in fact, only sought "[n]on-economic damages" based on that claim.
In their motion to dismiss, defendants argued that plaintiffs failed to allege that they suffered any injury to an economic relationship based on Niswender's improper conduct. In response, plaintiffs asserted that they had stated a claim because alleging that "making somebody's working conditions more onerous is sufficient" to allege an injury to an economic relationship. The trial court agreed with defendants and dismissed plaintiffs' claim.
To maintain a claim for interference with an economic relationship, a plaintiff must establish an injury to an economic relationship. Banaitis v. Mitsubishi Bank Ltd. , 129 Or. App. 371, 381, 879 P.2d 1288 (1994), rev. dismissed as improvidently allowed , 321 Or. 511, 900 P.2d 508 (1995). "That injury requirement may be satisfied by proof that the defendant caused a third party actually to breach its contract with plaintiff" or by proof that "defendant's wrongful actions have rendered plaintiff's obligations more onerous or prevented plaintiff from realizing the full benefit of his contract with a third party." Id. (internal quotation marks omitted). However, "[c]onduct that causes a plaintiff to suffer stress in the performance of his or her contract is not sufficient" to establish an injury. Id.
For example, in Banaitis , we concluded that a claim that a negative evaluation based on falsehoods caused the plaintiff to suffer emotional distress did not establish that the "plaintiff suffered an injury to his contractual relation."
*667 Id. at 382, 879 P.2d 1288. Similarly, in Franklin v. PCC , 100 Or. App. 465, 467-69, 787 P.2d 489 (1990), we explained that the plaintiff had not alleged an injury to an economic relationship when he alleged that his supervisor interfered in his economic relationship with his employer by: (1) engaging in "a continuing pattern of discrimination and retaliation toward plaintiff"; (2) "issuing false reprimands"; (3) "shoving" the plaintiff; (4) "using the racial epithet 'boy' "; (5) "failing to recommend training"; (6) "attempting to lock [the plaintiff] in [his supervisor's] office"; and, (7) "suggesting that [the plaintiff] apply for a job" at another employer. We also concluded that the plaintiff's further allegation that his supervisor's conduct had resulted in stress causing the plaintiff to take a total of 280.5 hours of paid sick leave was legally not an "injury to his economic relationship." Id . As a result, we concluded that the plaintiff in that case had not alleged a claim for intentional interference with an economic relationship.[5] Id. at 469, 787 P.2d 489. We noted that, even though the plaintiff had alleged that he had endured a significant amount of deplorable behavior at the hands of his supervisor, the plaintiff did not allege that his supervisor's actions or his own resulting stress caused his employer "to withhold or reduce any benefits of the employment contract." Id .
Here, like in Banaitis and Franklin , plaintiffs only alleged conduct that caused plaintiffs to suffer stress in the performance of their contracts. See Banaitis , 129 Or. App. at 381, 879 P.2d 1288. As noted, plaintiffs alleged that Niswender subjected them to investigations based on false information, "false and misleading allegations," "extended suspensions," and "onerous supervision." However, plaintiffs did not allege that those actions by Niswender, or any stress relating from those actions, caused the Lottery "to withhold or reduce any benefits of the employment contract" or caused any other damage to an economic relationship. Franklin , 100 Or. App. at 469, 787 P.2d 489.
Absent an allegation that Niswender's actions caused the Lottery to terminate its relationship with plaintiffs or an allegation indicating how his actions-including *668 the increased supervision-"rendered plaintiff[s'] obligations more onerous or prevented plaintiff[s] from realizing the full benefit of [their] [economic relationship] with [the Lottery]," *104 plaintiffs failed to allege ultimate facts that, if proved, would constitute a claim for intentional interference with an economic relationship. Banaitis , 129 Or. App. at 381, 879 P.2d 1288 (internal quotation marks omitted). Accordingly, the trial court did not err when it dismissed that claim.
C. Goldsmith's Documents
In their third assignment of error, plaintiffs assert that the trial court erroneously denied two motions to compel the production of documents relating to (1) Goldsmith's investigations of plaintiffs' department and the sexual harassment and retaliation claims against Niswender, and (2) DOJ's contract with Goldsmith. As noted above and discussed more fully below, DOJ hired Goldsmith as an outside investigator to investigate plaintiffs' department and Meyer's complaints regarding Niswender. Defendants refused to produce responsive documents, asserting that the documents were exempt from discovery under ORCP 36 B(3) because they were work product and that plaintiffs failed to make a showing that they had a substantial need for the materials and were unable to obtain the substantial equivalent of the materials by other means.
In their first motion to compel production, plaintiffs argued that they had a substantial need for the documents because they "have a material influence on the litigation." However, they did not argue that obtaining the substantial equivalent of those materials would impose an undue hardship. Plaintiffs also asserted that the documents they sought to have produced could not be protected under ORCP 36 B(3) because defendants waived that privilege when they disclosed part of the final report of one of Goldsmith's two investigations to plaintiffs. The trial court agreed with defendants and denied plaintiffs' motion, "except to the extent that there are any papers, memoranda, emails or other Lottery paperwork in the possession of the Department of Justice that was generated by the Lottery in its normal course of business and not as a result of the Department of Justice or Goldsmith investigation, or is otherwise privileged."
*669 After the court denied plaintiffs' initial motion, they filed a similar motion to compel "defendants to produce documents on the formation of Goldsmith's 'expert witness' (business agreement) contract with the state of Oregon and investigation of only plaintiffs * * *, excluding any documents or content containing the opinions and mental impressions of attorneys for the defendant State of Oregon\Oregon Lottery." (Underscoring in original.) Again, they argued that they had a substantial need for the documents without arguing that they would suffer undue hardship in obtaining the substantial equivalent of those documents, and that defendants waived the protection of the work-product doctrine when they provided plaintiffs with the report regarding plaintiffs' misconduct. That motion was also denied.
On appeal, plaintiffs and defendants make the same arguments that they made to the trial court. After reviewing the record and law, we conclude that the trial court did not err in refusing to order the production of work-product materials. Plaintiffs failed to present any valid argument as to why the requested material was discoverable, and, as a result, the trial court did not abuse its discretion when it denied plaintiffs' motion to compel those documents' production.
We review a trial court's decision regarding whether a party may obtain documents created in anticipation of litigation for abuse of discretion. Doe v. Denny's, Inc. , 146 Or. App. 59, 67, 931 P.2d 816 (1997), aff'd , 327 Or. 354, 963 P.2d 650 (1998). The rule for discovering documents prepared in anticipation of litigation is stated in ORCP 36 B(3):
"[A] party may obtain discovery of documents and tangible things otherwise discoverable under subsection B(1) of this rule and prepared in anticipation of litigation or for trial by or for another party or by or for that other party's representative (including an attorney, consultant, surety, indemnitor, insurer, or agent) only upon a showing that the party seeking discovery has substantial need of the materials in the preparation of such party's case and is unable without undue hardship to obtain the substantial equivalent of the materials by other means. In ordering discovery of *105 such materials when the required showing has been made, the court shall protect against disclosure of the mental *670 impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation."
In this case, the trial court did not err in determining that the documents produced by Goldsmith for her investigation were "prepared in anticipation of litigation or for trial by or for" defendants or defendants' "representative." Id. Goldsmith is an outside attorney. DOJ hired Goldsmith to conduct her investigation under an "Expert Witness Contract" that called for "an independent review of certain factual allegations" "based on the prospect of litigation." Plaintiffs do not appear to contest that the Goldsmith investigation documents are work product created in anticipation of litigation.[6] As a result, in order to compel production of those documents, plaintiffs had the burden "to demonstrate that [those documents] fell within an exception to the prohibitions against discovery of work products." Doe , 146 Or. App. at 68, 931 P.2d 816. Plaintiffs failed to do so.
First, plaintiffs argue that "[f]actual attorney work product is discoverable" and, thus, they are entitled to discover Goldsmith's factual work product. Although plaintiffs correctly point out that ORCP 36 B(3) treats "factual" work product differently than "opinion" work product, they wrongly assert that factual work product is always discoverable. As noted, ORCP 36 B(3) provides, in part, that
"a party may obtain discovery of documents and tangible things otherwise discoverable under * * * this rule and prepared in anticipation of litigation * * * only upon a showing that the party seeking discovery has substantial need of the materials in the preparation of such party's case and is unable without undue hardship to obtain the substantial equivalent of the materials."
However, that rule goes on to note that, once a showing of substantial need and undue hardship has been made, "the court shall protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney *671 or other representative of a party concerning the litigation" contained within the discoverable documents and tangible things. Id.
Thus, the rule does not provide, as plaintiffs seem to suggest, that factual work product is always discoverable, whereas opinion work product is discoverable with a showing of substantial need and undue hardship. Instead, it provides that factual work product is subject to a qualified protection because it is discoverable upon a showing of substantial need and undue hardship, whereas opinion work product-"the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party"-is never discoverable. See Laird C. Kirkpatrick, Oregon Evidence § 503.14, 361 (6th ed. 2013) (recognizing that work product doctrine is a "qualified" immunity because "it can be overcome upon a showing of substantial need and hardship " (emphasis in original)); see also Kathleen Waits, Opinion Work Product: A Critical Analysis of Current Law and a New Analytical Framework , 73 Or. L. Rev. 385, 433 (1994) ("In contrast to opinion work product, ordinary work product typically contains factual information. Thus, conventional wisdom declares that protection for ordinary work product, while normally justified, should not be available if the facts contained in the ordinary work product are sufficiently important and unavailable elsewhere."). As a result, contrary to plaintiffs' assertions otherwise, factual work product is only discoverable under ORCP 36 B(3) with a showing of substantial need and undue hardship.[7]
*106 Turning to that test, plaintiffs failed to demonstrate that they are entitled to Goldsmith's factual work product because they had both a "substantial need of the materials in the preparation of such party's case"and that they were "unable without undue hardship to obtain the substantial equivalent of the materials by other means." ORCP 36 B(3).
*672 In the trial court and in their arguments to us, plaintiffs asserted that they had a substantial need for the various documents related to Goldsmith's investigations; however, as noted, plaintiffs never made any showing that they were "unable without undue hardship to obtain the substantial equivalent of the materials by other means." ORCP 36 B(3). As a result, the trial court did not abuse its discretion in concluding that the substantial need and undue hardship exception does not apply.
Plaintiffs next argue that, in any event, defendants waived work-product protection when they disclosed Goldsmith's report regarding, in part, plaintiffs' alleged workplace misconduct. We review a trial court's decision regarding waiver for errors of law. See State ex rel. OHSU v. Haas , 325 Or. 492, 498, 942 P.2d 261 (1997) (reviewing a trial court's decision regarding waiver of attorney-client privilege for "errors of law"). Plaintiffs assert that, by producing that report, defendants waived all work-product protection as to "all communication on the same subject." Neither we nor the Supreme Court have decided the issue, but federal authority suggests that, under FRCP 26(b)(3) -the federal rule regarding work-product protection-"disclosure of some documents does not necessarily destroy work-product protection for other documents of the same character." Charles A. Wright and Arthur R. Miller, 8 Federal Practice and Procedure § 2024 (3d ed. 2018) ; see also Appleton Papers, Inc. v. E.P.A. , 702 F.3d 1018, 1025 (7th Cir. 2012) (also stating that "disclosure of some documents does not necessarily destroy work-product protection for other documents of the same character" (internal quotation marks omitted)); Williams & Connolly v. S.E.C. , 662 F.3d 1240, 1244 (DC Cir. 2011) (same); Pittman v. Frazer , 129 F.3d 983, 988 (8th Cir. 1997) (stating that "disclosure to an adversary waives work product protection as to items actually disclosed " (emphasis added)); Duplan Corp. v. Deering Milliken, Inc. , 540 F.2d 1215, 1222 (4th Cir. 1976) (noting that "subject matter waiver analogous to those applicable to claims of attorney-client privilege are inappropriate when applied to [work-product protection]").
Because FRCP 26(b)(3) and ORCP 36 B(3) are nearly identical, we find the above quoted authority interpreting that rule persuasive when interpreting ORCP 36 *673 B(3). As a result, we conclude that, under ORCP 36 B(3), disclosure of some documents does not waive work-product protection for all other documents on the same subject. Accordingly, the trial court did not err in concluding that defendants did not waive work-product protection as to any of the requested documents other than Goldsmith's report regarding plaintiffs, which Sugahara produced to plaintiffs.
Plaintiffs cite Goldsborough v. Eagle Crest Partners, Ltd. , 314 Or. 336, 339 n. 4, 838 P.2d 1069 (1992), for the principle that voluntary disclosure of an attorney-client privileged document waives the privilege for all attorney-client communications on the same subject matter. First, we note that Goldsborough 's holding does not address subject-matter waiver. Goldsborough ultimately held that a client, through its attorney, had waived the attorney-client privilege as to a particular attorney-client privileged letter, which could then be admitted into evidence at trial. Id. at 343, 838 P.2d 1069. Second, Goldsborough examines the waiver of the attorney-client privilege and not the waiver of work-product protection. As we note above, persuasive federal authority treats the extent of waiver differently for the work-product doctrine than for the attorney-client privilege. Work-product waiver is generally treated on a per document basis and not based on subject-matter waiver.[8]
*107 Consequently, because Goldsmith's documents are work product and plaintiffs failed to demonstrate that those documents fell into an exception to ORCP 36 B(3), the trial court did not abuse its discretion in denying plaintiffs' motions to compel.
D. Motion for Summary Judgment
In their final assignment of error, plaintiffs argue that the trial court erred in granting summary judgment in favor of defendants on plaintiffs' retaliation claims.[9] They argue that they created a genuine issue of material fact that *674 they suffered adverse employment actions at the hands of defendants and that those adverse actions were motivated by an intent to retaliate against plaintiffs.
When reviewing the trial court's grant of a motion for summary judgment, we view the evidence and all reasonable inferences that may be drawn from the evidence in the light most favorable to the nonmoving party-here plaintiffs-to determine whether the moving party is entitled to judgment as a matter of law. Jones v. General Motors Corp. , 325 Or. 404, 408, 939 P.2d 608 (1997). The trial court "shall grant" summary judgment if the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to prevail as a matter of law." ORCP 47 C. We recount the material facts from the summary judgment record.
Plaintiffs are both long-time employees of the Lottery. Both are managers. Both plaintiffs worked under Niswender.
From at least sometime in 2008 until approximately July 2010, Niswender purportedly undertook a series of actions that the trial court concluded-and no party disputes on appeal-a reasonable factfinder could determine constituted sexual harassment of Meyer. That harassment eventually ended after Meyer sent Niswender emails and text messages indicating that she wanted only a professional relationship with him and that she thought that some of his behavior-such as texting her about personal matters after work hours-was inappropriate.
Meyer told two people at work about her concerns regarding Niswender's harassing behavior-her direct supervisor and another manager who was outside of her chain of command. However, after conveying her story, she specifically told her supervisor not to do anything about her report, even though her supervisor offered to take her complaint to human resources. Respecting her wishes, both her supervisor and the other manager did nothing, and no investigation into Niswender's behavior occurred until, as discussed below, plaintiffs were placed on paid administrative leave, and Meyer filed an official complaint regarding Niswender's actions.
*675 Around the time that Niswender was making his advances, plaintiffs began their relationship with each other. At the time, plaintiffs were both married to other people. Eventually, in 2010, other employees of the Lottery discovered plaintiffs' extramarital relationship and filed a number of anonymous complaints with the Lottery's online grievance system expressing their disapproval of the relationship. In response to those complaints, a short internal investigation was held regarding whether plaintiffs were abusing their work email to further their relationship. That investigation found no infractions by plaintiffs.
After the initial investigation, Wooldridge attended a conference on the Oregon coast related to his work for the Lottery. The Lottery paid for Wooldridge's travel and hotel room. Meyer decided to accompany Wooldridge on the trip and, after getting approval from her supervisor, indicated to her supervisees that she would be "working remotely" while on the trip-though she did not tell her supervisees where she was going. After her supervisees learned that Meyer was at the coast with Wooldridge, they filed a number of new complaints with the Lottery's human resources department, and a new investigation into the effect of plaintiffs' relationship on their work was launched.
Because of a concern that the human resources department could be biased, DOJ hired Goldsmith as an impartial investigator to conduct the investigation. After being interviewed *108 by Goldsmith, Meyer had concerns that the investigation was expanding into areas of her job in which Goldsmith had no expertise and conveyed those concerns to Niswender. A few days after that conversation, both plaintiffs were placed on paid administrative leave pending the results of the investigation.
Plaintiffs requested formal notice as to why they were placed on leave. Although the Lottery has a policy of providing notice within seven days to employees placed on leave, plaintiffs did not receive notice for approximately one month. Instead, plaintiffs received correspondence indicating that, due to certain constraints, the Lottery would be unable to provide timely notice.
*676 After being placed on leave, Meyer filed a sexual harassment and retaliation complaint against Niswender on April 16, 2011, based on his prior actions up until July 2010 and her concerns that other women in the Lottery were being sexually harassed. DOJ hired Goldsmith to investigate that complaint as well. Wooldridge also lodged a complaint against the Lottery on May 5, 2011, alleging that he was being retaliated against to punish Meyer for her sexual harassment claims.
At the conclusion of the investigations into plaintiffs' alleged workplace misconduct and Niswender's alleged sexual harassment, two disciplinary meetings were held-one for each plaintiff. Each plaintiff attended his or her meeting with their attorney. The Lottery was represented at the meetings by Sugahara, Durbin, and Edsall, an employee of the Lottery's human resources department. At those meetings on June 17, 2011, plaintiffs were each given disciplinary letters detailing their alleged workplace misconduct and indicating that they were allowed to come back to work subject to increased supervision. Plaintiffs were not, however, subject to demotions, loss in salary, or loss in benefits. The letters also indicated that the discipline could not be appealed. At the disciplinary meetings, the Lottery gave plaintiffs, for their review, partially redacted copies of the reports that detailed their alleged workplace misconduct. Plaintiffs and their attorney retained those reports after those meetings despite requests from Sugahara and Durbin to return the reports after they had reviewed them. Plaintiffs indicated that they were retaining the copies of the reports for the purpose of undertaking a "name-clearing hearing." Plaintiffs offered and agreed to allow only their attorney to read the reports and otherwise not to publish them. At that time, and in a later email, Sugahara indicated to plaintiffs that their continued retention of the reports threatened to remove them from the applicable exemptions from public records law such that, if a public records request was filed, the reports might have to be disclosed.
Following those meetings, plaintiffs returned to work and requested name-clearing hearings where they could dispute the disciplinary letters. The Lottery attempted to schedule those hearings for plaintiffs, but plaintiffs *677 withdrew their requests after learning that any hearing would be public. During that time period, a media outlet filed a public records request for Goldsmith's report regarding plaintiffs. Once plaintiffs withdrew their requests for hearings, DOJ publicly released the report on August 9, 2011, as requested.
As discussed above, plaintiffs eventually brought the current action. In it, they alleged that the Lottery subjected Meyer to retaliation in violation of ORS 659A.030 because she reported Niswender's sexual harassment of Meyer and others. Further, plaintiffs alleged that the Lottery subjected Wooldridge to retaliation in violation of ORS 659A.030 and 42 USC section 2000e (Title VII), based on his romantic relationship with Meyer and the fact that Meyer resisted Niswender's sexual harassment.
Defendants moved for summary judgment. In their motion, defendants argued that plaintiffs failed to raise a genuine issue of fact that they had suffered an adverse employment action necessary to sustain their claims. Further, defendants argued that, even if plaintiffs had suffered adverse employment actions, plaintiffs failed to prove that those actions were taken with intent to retaliate against plaintiffs. Plaintiffs responded that they had suffered adverse employment actions and that those actions were undertaken with the intent to retaliate. The *109 trial court agreed with defendants and granted their motion for summary judgment "[f]or the reasons set forth in" defendants' memoranda. With that in mind, we now turn to plaintiffs' arguments on appeal.
Plaintiffs contend that they created a genuine issue of material fact on all of the elements of their retaliation claims under Title VII and Oregon law. We agree with plaintiffs insofar as their claims reach the notices of discipline they received from the Lottery and the publication of the Goldsmith report regarding their alleged misconduct. Accordingly, we reverse the trial court's grant of summary judgment as to the retaliation claims.
Under ORS 659A.030(1)(f), "[i]t is an unlawful employment practice * * * [f]or any person to discharge, expel or otherwise discriminate against any other person because *678 that other person has opposed any unlawful practice, or because that other person has filed a complaint, testified or assisted in any proceeding under this chapter or has attempted to do so." Similarly, under 42 USC section 2000e-3(a), it is unlawful "for an employer to discriminate against any of his employees * * * because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."
To establish a prima facie case of retaliation under section 2000e-3(a), plaintiffs need to demonstrate that "(1) [they] engaged in protected activity opposing discrimination; (2) [they] experienced a materially adverse action, that is, an action that a reasonable employee would find materially adverse; and (3) a causal connection exists between the protected activity and the adverse action." Steele v. Mayoral , 231 Or. App. 603, 616, 220 P.3d 761 (2009). The elements of a prima facie case under ORS 659A.030(1)(f) are substantially similar. See Medina v. State of Oregon , 278 Or. App. 579, 588, 377 P.3d 626 (2016) (noting that, to establish an ORS 659A.030(1)(f) claim, plaintiffs must show that (1) they engaged in the protected activity of complaining of discrimination, (2) they were subject to discriminatory action, and (3) the discriminatory action was taken against them because of their protected complaint); PSU Association of University Professors v. PSU , 352 Or. 697, 711-13, 291 P.3d 658 (2012) (noting that we "commonly * * * look[ ] to the framework used in analyzing claims brought under Title VII's antiretaliation provision specifically because the federal provision is substantially similar to" ORS 659A.030(1)(f) and, accordingly, adopting the federal "materially adverse" standard to define discriminatory actions under ORS 659A.030(1)(f) (internal citations omitted)).
On appeal, neither party disputes that plaintiffs established a genuine issue of material fact as to whether plaintiffs participated in protected activities. As a result, we focus only on the last two elements of plaintiffs' retaliation claims-whether plaintiffs suffered a materially adverse employment action and whether, assuming a materially adverse action occurred, a causal connection existed *679 between plaintiffs' protected activity and those materially adverse employment actions. We address each of those elements in turn.
Whether an employment action is materially adverse under both ORS 659A.030(1)(f) and section 2000e-3(a) -the statutes creating state and federal retaliation claims-is defined by the standard articulated in the Supreme Court's decision in Burlington N. & S. F. R. Co. v. White , 548 U.S. 53, 57, 126 S.Ct. 2405, 165 L.Ed. 2d 345 (2006) ( Burlington ). See PSU Association of University Professors , 352 Or. at 712-13, 291 P.3d 658 (adopting the Burlington "materially adverse" standard to claims made under ORS 659A.030(1)(f) ). In Burlington , the Court concluded that, in retaliation cases, "those (and only those) * * * actions that would have been materially adverse to a reasonable employee or job applicant" can constitute adverse actions. 548 U.S. at 57, 126 S.Ct. 2405 (emphasis added). According to the Court, for an employer's action to be materially adverse, that action "must be harmful to the point that [it] could well dissuade a reasonable worker from making or supporting a charge of discrimination." Id. Under that standard, an employment action can be adverse even where it does not affect *110 "the employee's compensation, terms, conditions, or privileges of employment." Id. at 61, 126 S.Ct. 2405 (internal quotation marks omitted).[10] "Context matters" when determining whether an action is materially adverse. Id . at 69, 126 S.Ct. 2405.
Here, plaintiffs allege that a number of employment actions taken by defendants were materially adverse. We write to address only those actions that we conclude could be materially adverse in the context of the facts of this case. Both plaintiffs alleged that they suffered materially adverse employment actions when they were subjected to an unjustified investigation, placed on extended paid administrative leave, given a disciplinary notice that imposed increased supervision, and were subjected to the publication of the allegedly false investigation report to the media.
*680 A plaintiff must meet a "relatively low bar" to demonstrate that an employment action is materially adverse under Burlington . Michael v. Caterpillar Financial Services Corp. , 496 F.3d 584, 596 (6th Cir. 2007), cert. den. , 552 U.S. 1258, 128 S.Ct. 1657, 170 L.Ed.2d 355 (2008). However, as noted above, what it takes to meet that bar depends on the context of the case. Burlington , 548 U.S. at 69, 126 S.Ct. 2405. For example, both this court and at least one federal appellate court have concluded that actions similar to those alleged by plaintiffs were materially adverse where those actions resulted in discipline. See Medina , 278 Or. App. at 589, 377 P.3d 626 (holding that "prediscipline notice," a "last chance agreement," an "investigatory meeting," and "placement of plaintiff on administrative leave" were materially adverse where those actions were predicates to termination); Michael , 496 F.3d at 596 (holding that "brief placement on paid administrative leave and the 90-day performance plan[ ] appear to meet th[e] relatively low bar" set by Burlington ). In contrast, other federal appellate courts have determined that similar employment actions were not adverse where those actions did not result in discipline. See, e.g. , Stewart v. Mississippi Transp. Com'n , 586 F.3d 321, 332 (5th Cir. 2009) (concluding that placement on paid administrative leave during an investigation was not a materially adverse action where the plaintiff "was reinstated with the same salary" and "[t]here was no suggestion that the leave was the result of any fault on [the plaintiff's] part, such as might carry a stigma in the workplace"); Nichols v. Southern Illinois University-Edwardsville , 510 F.3d 772, 786-87 (7th Cir. 2007) (concluding that placement on paid administrative leave during an investigation was not materially adverse where the plaintiff did not claim that "his position, salary, or benefits were impacted" by the leave and he was reinstated to his previous position after the investigation concluded).
After reviewing the record, viewing the evidence and reasonable inferences in the light most favorable to plaintiffs, we conclude that, in this case, a reasonable factfinder could conclude that the Goldsmith investigation, the placement on paid administrative leave, the disciplinary letter imposing increased supervision, and the release of the Goldsmith report to the media "could well dissuade a reasonable worker from making or supporting a charge of *681 discrimination." The investigation, the placement on administrative leave, and the disciplinary letter are all materially adverse because, like in Medina and Michael , those actions resulted in discipline to plaintiffs, here in the form of increased supervision and a last-chance agreement. Similarly, the release of the Goldsmith report to the media is materially adverse as it could result in ridicule and ostracism by other employees and be perceived as "the boss * * * sending a warning." Halliburton, Inc. v. Administrative Review Bd. , 771 F.3d 254, 262 (5th Cir. 2014), reh'g den. , 596 Fed. Appx. 340 (5th Cir. 2015) (applying the Burlington standard to a statutory retaliation claim under the Sarbanes-Oxley Act); see also *111 Lore v. City of Syracuse , 670 F.3d 127, 164 (2d Cir. 2012) (noting that a "jury could reasonably conclude that a public comment by the municipality's top lawyer implying or confirming that" an employee had engaged in misconduct, "though not affecting the terms or conditions of [that employee's] employment, might well have dissuaded a reasonable [person] from making a complaint of discrimination" (internal citations and quotation marks omitted)). As a result, the trial court erroneously concluded that plaintiffs failed to create a genuine issue of material fact as to whether the Goldsmith investigation, the placement on paid administrative leave, the disciplinary letter imposing increased supervision, and the release of the Goldsmith report to the media were materially adverse and could constitute actionable employment activity under ORS 659A.030(1)(f) and section 2000e-3(a).
Because granting summary judgment would still be correct if there was no connection between plaintiffs' protected actions and the Lottery's adverse acts, we next turn to the trial court's conclusion that plaintiffs failed to prove that causal connection. Plaintiffs assert that the timing of defendants' actions, sometimes in combination with other factors, provided sufficient evidence of causation to raise a fact issue to survive a summary judgment motion. At least insofar as those arguments reach the disciplinary letter imposing increased supervision and the public release of the Goldsmith report, we agree.
Proof of a causal connection between protected conduct and a materially adverse action can be established *682 (1) "indirectly , by showing that the protected activity was followed closely by discriminatory treatment or through other evidence such as disparate treatment of fellow employees who engaged in similar conduct" or (2) "directly , through evidence of retaliatory animus directed against a plaintiff by the defendant." Boynton-Burns v. University of Oregon , 197 Or. App. 373, 380, 105 P.3d 893 (2005) (emphases in original; internal quotation marks omitted). In Boynton-Burns , we elaborated on the initial portion of that test by noting that, "[i]f the plaintiff attempts to establish the causal connection indirectly, relying on mere temporal proximity between the events, the events must be 'very close' in time." 197 Or. App. at 381, 105 P.3d 893 (citing Clark County School Dist. v. Breeden , 532 U.S. 268, 273, 121 S.Ct. 1508, 149 L.Ed. 2d 509 (2001) ).
Oregon case law has not identified how "very close" in time the discriminatory treatment must follow the protected activity such that, by itself, the timing raises an issue of fact regarding causation. We have noted previously that the Ninth Circuit Court of Appeals, when analyzing federal retaliation claims, has rejected a bright line rule by which temporal proximity alone supports an inference of retaliation "without additional evidence of the surrounding circumstances that supports such an inference." Brunick v. Clatsop County , 204 Or. App. 326, 341, 129 P.3d 738 (2006) (citing Coszalter v. City of Salem , 320 F.3d 968, 978 (9th Cir. 2003) ). But see Allen v. Iranon , 283 F.3d 1070, 1078 (9th Cir. 2002) (while rejecting a bright line rule, the Ninth Circuit has, on occasion, recognized that "proximity in time constitutes circumstantial evidence of retaliatory motive"); Anthoine v. North Central Counties Consortium , 605 F.3d 740, 751 (9th Cir. 2010) (" Coszalter did not repudiate Allen 's holding that proximity in time may constitute circumstantial evidence of retaliatory motive."); Passantino v. Johnson & Johnson Consumer Prods., Inc. , 212 F.3d 493, 507 (9th Cir. 2000) ("[W]hen adverse employment decisions are taken within a reasonable period of time after complaints of discrimination have been made, retaliatory intent may be inferred.").
Significantly, we declined to adopt any particular temporal rule in Brunick , but concluded, regardless, that a gap of 13 months between the plaintiff's protected activity *683 and an allegedly retaliatory termination was, "without more," insufficient to create an issue of fact on causation. Brunick , 204 Or. App. at 342, 129 P.3d 738. In analyzing a retaliation claim under section 2000e-(3)(a), the United States Supreme Court has concluded that a 20-month gap between a complaint and an alleged retaliatory action does not, by itself, raise an inference of causation. Breeden , 532 U.S. at 274, 121 S.Ct. 1508. In doing so, the Court cited case law from the federal circuit courts that concluded that a three or four month gap is also insufficient. *112 Id . at 273-74, 121 S.Ct. 1508. However, the Ninth Circuit has concluded that a reasonable jury could infer causation where the plaintiff was terminated 59 days after she met with the Equal Employment Opportunity Commission. Miller v. Fairchild Indus., Inc. , 885 F.2d 498, 505 (9th Cir. 1989), cert. den. , 494 U.S. 1056, 110 S.Ct. 1524, 108 L.Ed.2d 764 (1990). Outside of the Ninth Circuit, federal courts have concluded that, in some circumstances, a gap of six weeks to two months is sufficient to infer causation for a federal retaliation claim. See Wilson v. Arkansas Department of Human Services , 850 F.3d 368, 373 (8th Cir. 2017) (holding that a complaint that alleged a "six-week period between the EEOC charge and the termination plausibly alleges a but-for causal connection"); Dye v. Office of the Racing Commission , 702 F.3d 286, 305 (6th Cir. 2012) (holding that a gap of two months or less is sufficient to raise an issue of fact on causation in a First Amendment retaliation claim).
Reviewing the case law, we conclude that the gap of one to two months between the claimed protected activity and the subsequent adverse action in this case is sufficient to raise an issue of fact on causation. Here, the only protected activities alleged by plaintiffs are Meyer's formal complaint of sexual harassment against Niswender, which was filed on April 16, 2011, and Wooldridge's complaint that he was being retaliated against as a way to "get[ ] to * * * Meyer" on May 5 of that same year. The disciplinary letters imposing increased supervision were issued on June 17, 2011-approximately two months after Meyer's complaint and one month after Wooldridge's complaint. Given the relatively short time period between plaintiffs' participation in protected activities and the issuance of the disciplinary notices, we conclude that, on this summary judgment record, that *684 short temporal proximity is indirect evidence of causation that defeats defendants' summary judgment motion.
With respect to the release of the Goldsmith report to the public, it was released on August 9, 2011, which was within four months of plaintiffs' complaints. However, here, plaintiffs do not rely on temporal proximity alone. As relevant to the release of the Goldsmith report, evidence that "would allow a factfinder to conclude that defendant[s'] proffered explanation" for releasing the report-i.e. , that they were required to disclose the report under Oregon public records law-"was a pretext for the actual reason" is further indirect evidence of causation. See LaCasse v. Owen , 278 Or. App. 24, 35-36, 373 P.3d 1178 (2016) (holding that close temporal proximity of an adverse act to a protected action when combined with additional evidence that "would allow a factfinder to conclude that defendant's proffered explanation was a pretext for the actual reason that plaintiff was terminated" created a genuine issue of material of fact as to causation).
"Every person has a right to inspect any public record of a public body in this state" unless a document is exempt from disclosure as provided by statute. ORS 192.314(1). Goldsmith's report is unquestionably a public record. A "public record" is "any writing that contains information relating to the conduct of the public's business * * * prepared, owned, used or retained by a public body regardless of physical form or characteristics." ORS 192.311(5)(a). However, Goldsmith's report may also be exempt from disclosure. ORS 192.345(12) provides that "personnel discipline action[s], or materials or documents supporting th[ose] action[s]," which might include Goldsmith's report, are exempt from disclosure under Oregon's public records laws unless "the public interest requires disclosure in the particular instance." Although the Goldsmith report was released because of a request from the media, the fact that it may have been released in violation of ORS 192.345(12) could lead a reasonable factfinder to conclude that the reason given for the release of the report-because the media requested it-was pretextual.[11] As a result, *113 plaintiffs created a genuine issue *685 of material fact as to causation regarding (1) the issuances of the disciplinary letters imposing increased supervision based on the timing those letters were issued and (2) the release of the Goldsmith report to the media based on the timing of that release and the possibility that its release was pretextual.
In contrast, plaintiffs failed to create a genuine issue of material fact regarding causation between the initiation of the Goldsmith investigation and their placement on administrative leave and their protected activity. As noted, the protected activities alleged by plaintiffs are Meyer's April 16, 2011, formal complaint of sexual harassment against Niswender and Wooldridge's complaint on May 5 of that same year. Both of those actions took place after Goldsmith began her investigation into plaintiffs and plaintiffs were placed on administrative leave. Accordingly, as a matter of chronology, those adverse actions could not have been caused by plaintiffs' protected activities.[12] See Folz v. ODOT , 287 Or. App. 667, 677, 404 P.3d 1036 (2017), rev. den. , 362 Or. 482, 412 P.3d 197 (2018) ("Where the decision to take an adverse employment action is made prior to any protected activity, no factfinder could find the requisite causal link between the employment action and the protected conduct.").
*686 We conclude that, viewing the evidence in the light most favorable to plaintiffs, plaintiffs created a genuine issue of fact as to whether both the disciplinary notices they received imposing additional supervision and the release of the Goldsmith report to the media were caused by their participation in protected activity. Plaintiffs did not create a similar issue of fact regarding the remaining adverse actions. Accordingly, the trial court erred in granting defendants summary judgment on plaintiffs' retaliation claims insofar as those claims reach the issuance of the disciplinary notices and the release of the Goldsmith report.
III. CONCLUSION
In sum, the trial court erred in dismissing plaintiffs' freedom of association section 1983 claim but did not err in dismissing any of plaintiffs' other section 1983 claims or plaintiffs' intentional interference with an economic relationship claim. Further, the trial court did not err in denying plaintiffs' motions to compel production of the documents produced and retained by Goldsmith during her investigations of plaintiffs' department and Niswender's alleged sexual harassment and retaliation. Finally, the trial court did not err in granting summary judgment on plaintiffs' statutory retaliation or sexual discrimination claims, with the exception of plaintiffs' retaliation claims insofar as they relate to the disciplinary letters that plaintiffs received from defendants and defendants' release of Goldsmith's report to the media.
Reversed and remanded as to plaintiffs' section 1983 freedom of association claim and retaliation claims; otherwise affirmed.

Since this appeal was submitted, Gail Wooldridge substituted as plaintiff for the now deceased Martin Wooldridge. However, for purposes of this opinion, we continue to refer to Martin Wooldridge and Sarah Meyer as "plaintiffs." Further, for ease of reference, we use the terms "defendants" to refer to all defendants; otherwise, we refer to individual defendants by their last name or as "the Lottery" as necessary.

Plaintiffs also assert that the trial court erred in granting summary judgment on their state and federal sexual discrimination claims, but we reject that portion of plaintiffs' fifth assignment of error without discussion.

Plaintiffs neither amended their section 1983 claims nor sought leave from the trial court to amend those claims after the court initially dismissed them. In light of that failure, the court had discretion to ultimately dismiss those claims with prejudice. See Alfieri v. Solomon , 358 Or. 383, 412, 365 P.3d 99 (2015) ("[W]hen ORCP 25 A is triggered, for example, by the grant of a motion to dismiss, and the plaintiff does not seek leave to amend, the court may, in its discretion, order the complaint dismissed with prejudice."). Plaintiffs fail to explain on appeal how the trial court abused its discretion in doing so or how they would have amended the section 1983 allegations to respond to the court's dismissal of their claims. For those reasons, we reject plaintiffs' argument that the trial court committed any error in purportedly not permitting an amended complaint.

In their complaint, plaintiffs did not allege or acknowledge that they had been in an extramarital relationship. This only later became apparent in the record during the course of the litigation. We, again, note this issue only because it is likely to arise on remand.

We also held in Franklin that such conduct did give rise to a claim for intentional infliction of emotional distress. 100 Or. App. at 472, 787 P.2d 489.

For instance, plaintiffs argued before us that they are entitled to discovery of the Goldsmith investigation documents "regardless of whether or not the documents were work product" and that Oregon law "provide[s] for the [d]iscovery of work product."

Plaintiffs argue that their view is supported by State v. Riddle , 330 Or. 471, 8 P.3d 980 (2000) (interpreting ORS 135.855(1)(a), a statute governing the different procedures in criminal discovery), A. G. v. Guitron , 351 Or. 465, 268 P.3d 589 (2011) (interpreting ORCP 44, a rule that ORCP 36 B(3) expressly recognizes as an exception to work-product protection), and State v. Gallup , 108 Or. App. 508, 816 P.2d 669 (1991) (also interpreting ORS 135.855(1)(a), not ORCP 36 B(3)). All three of those cases are inapposite and do not support plaintiffs' position.

Finally, we reject as unpreserved plaintiffs' argument that discovery of those documents was required under ORS 652.750.

As noted, we reject plaintiffs' argument that the trial court also erred in granting summary judgment on plaintiffs' sexual discrimination claims without further discussion.

In concluding that plaintiffs did not create a genuine issue of material fact as to whether they suffered a materially adverse employment action, both the trial court and defendants mistakenly relied on the standard for federal sexual discrimination claims articulated by the United States Supreme Court in Burlington Industries, Inc. v. Ellerth , 524 U.S. 742, 761, 118 S.Ct. 2257, 141 L.Ed. 2d 633 (1998) -i.e. , a discriminatory action must constitute "a significant change in employment status."

We recognize that there may be arguments regarding whether and how ORS 192.345(12) applies to the state's public disclosure of the Goldsmith report. However, the record indicates that, because defendants mistakenly believed that the release of the Goldsmith report could not constitute a materially adverse act, they never developed the legal and factual record necessary to make such arguments to the trial court and us. Without an adequately developed record regarding those arguments, we cannot determine whether they would sufficiently undermine plaintiffs' evidence such that we could conclude that plaintiffs failed to present a genuine issue of material fact as to causation.

On appeal, plaintiffs also contend that Meyer engaged in protected conduct when she previously reported Niswender's sexual harassment to her supervisor and another member of the executive staff. Plaintiffs contend that Niswender initiated an investigation of plaintiffs because of Meyer's report. However, Meyer testified in her deposition that, when she reported that harassment, she asked that no formal actions notifying Niswender of her complaints be taken and that her request was complied with. Niswender's undisputed testimony reveals that, prior to Meyer's formal complaint, he had never been accused by anyone of acting inappropriately with women. Accordingly, because plaintiffs provided no evidence supporting a reasonable inference that Niswender, the person plaintiffs allege undertook the adverse actions, knew of Meyer's previous complaints, plaintiffs did not create a genuine issue of material fact regarding whether those complaints caused later adverse employment actions.